**BAPTIST HEALTHCARE SYSTEMS, INC. d/b/a Central Baptist Hospital, Appellant,**

v.

**Golda H. MILLER, et al., Appellees.**

No. 2003–SC–471–DG.

Supreme Court of Kentucky.

Aug. 25, 2005.

Rehearing Denied Dec. 22, 2005.

Gregory K. Jenkins, F. Allon Bailey, Lynn Rikhoff Kolokowsky, Jenkins Pisacano Robinson & Bailey, Lexington, Counsel for Appellant.

Fred E. Peters, Ashley Rogers Dye, Lexington, Counsel for Appellees.

E. Andre' Busald, Jay R. Vaughn, Busald Funk Zevely PSC, Florence, Counsel for Amicus Curiae, Kentucky Academy of Trial Lawyers.

Frank Stainback, Sullivan, Mountjoy, Stainback & Miller, P.S.C., Owensboro, Counsel for Amicus Curiae, Kentucky Defense Counsel, Inc.

Stephen R. Price, Carole D. Christian, Wyatt Tarrant and Combs, Louisville, Counsel for Amicus Curiae, Kentucky Hospital Association, Inc.

LAMBERT, Chief Justice.

Appellant, Baptist Healthcare, Inc., d/b/a Central Baptist Hospital appeals from the Kentucky Court of Appeals opinion affirming the judgment of the Fayette Circuit Court awarding Appellee, Golda Miller $100,100 for injuries received as a result of negligence. As we discern no abuse of trial court discretion in continuing the case to allow Ms. Miller to identify an expert, trial court error in denying Central Baptist's motion for summary judgment, or other reversible error, we affirm the Court of Appeals and the judgment of the Fayette Circuit Court.

On July 18, 1997, Golda Miller went to Central Baptist Hospital to have her blood

drawn upon her doctor's order. The phlebotomist[1] employed by Central Baptist Hospital placed a tourniquet on Ms. Miller's arm, and left her without supervision for approximately ten minutes. When the phlebotomist returned from answering a telephone call in another room, Ms. Miller's arm was swollen and had changed colors. Ms. Miller, who was eighty years old, experienced medical complications with her arm and sought treatment. After medical consultation, three physicians concluded that Ms. Miller was experiencing nerve problems with her right arm and specifically related her condition to the tourniquet incident of July 18, 1997.

Ms. Miller brought a negligence action against Central Baptist, and trial was initially scheduled for April 30, 2001. Before the case was tried, on April 9, 2001, Central Baptist moved for summary judgment on the grounds that Ms. Miller's claim was improperly classified as negligence rather than medical malpractice. Central Baptist claimed that a medial negligence case required an expert phlebotomist to testify as to the standard of care, and since Ms. Miller did not provide notice of an expert phlebotomist she could not establish evidence of the standard of care. On April 20, 2001, the Fayette Circuit Court held a hearing on the matter. During the hearing, counsel for Ms. Miller argued that the case was one of ordinary negligence rather than medical negligence since phlebotomists are not licensed or regulated in Kentucky. In support of this point, Ms. Miller added that Central Baptist's phlebotomist failed to meet her employer's standard of care as outlined in its employee training manual and videos. The trial court determined that due to the widespread use of phlebotomy, a specific medical standard of care was mandatory and necessitated expert testimony to establish whether that standard of care was met. The trial court thereby denied Central Baptist's motion for summary judgment and allowed a 30 day continuance for Ms. Miller to identify an expert under CR 26.

A two day jury trial began on September 26. Dr. Michael Balm testified that Ms. Miller's nerve injury was specifically related to the tourniquet incident of July 18, 1997 at Central Baptist Hospital. Ms. Miller produced expert witness Denise Dunn, a phlebotomist with the University of Kentucky and former employee of Central Baptist. Ms. Dunn testified that she assisted in the training of new phlebotomists at the University of Kentucky. She testified that a phlebotomist should never leave a patient alone, and that a tourniquet should be placed on a patient's arm for one to three minutes. She testified that if a tourniquet is left on a patient's arm for more than three minutes, the blood may become hemolyzed,[2] a process whereby the "cells are crushed." She stated that Hemolysis is the result of an improperly drawn blood sample and this is indicated by elevated levels of potassium, iron, cholesterol, and bilirubin. This portion of Ms.

---

1. A phlebotomist is a person trained in phlebotomy, which is defined as follows: "Incision into or needle puncture of a vein for the purpose of drawing blood." This process is also known as venipuncture: "The puncture of a vein, usually to withdraw blood or inject a solution." Stedman's Medical Dictionary (27th ed.2000).

2. "To produce hemolysis or liberation of the hemoglobin from red blood cells." Hemoly-

sis is defined as "[a]lteration, dissolution, or destruction or of red blood cells in such a manner that hemoglobin is liberated into the medium in which the cells are suspended, e.g., by specific complement fixing antibodies, toxins, various chemical agents, tonicity, alteration of temperature with subsequent release of hemoglobin." Stedman's Medical Dictionary (27th ed.2000).

Dunn's testimony was based upon a medical publication published in a seminar book by the National Committee on Clinical Laboratory Standards provided by her employer. She stated that she had read this document but did not understand it.

Central Baptist produced the testimony of Ms. Cynthia Applegate an employee and former director of its laboratory to interpret Ms. Miller's blood test results. At this point, Ms. Miller's counsel objected to the testimony arguing that any testimony concerning the lab report should not be admissible because it would constitute expert testimony and Ms. Applegate had not been disclosed as an expert witness until a day before trial. The trial court ruled that Ms. Applegate could read from the report and testify that there were no indications of any problems with the blood drawn, but prohibited her from interpreting the lab report.

At the conclusion of the trial, the jury returned a verdict in favor of Ms. Miller and awarded damages of $154,000. But the jury also found that Ms. Miller was 35 percent comparatively negligent, and reduced the verdict from $154,000 to $100,100. In its motion for directed verdict, Central Baptist sought to limit Ms. Miller's recovery of medical expenses only to those that are actually paid or payable, but to exclude contractual allowances imposed by payors. Central Baptist reasoned that it should not be held liable for medical charges that were neither paid nor able to be collected. The trial court delayed ruling on the motion until a verdict was rendered. The trial court overruled the motion to limit damages on the grounds that considering the equities and Central Baptist's negligence, the windfall, if any, should go to the injured party, Ms. Miller. The Court of Appeals affirmed, and this Court granted discretionary review.

## I.

■ Central Baptist contends that it was entitled to (CR 56) summary judgment or alternatively that a continuance should not have been granted to Ms. Miller. Central Baptist argues that at the time it moved for summary judgment, Ms. Miller had not named an expert to testify as to the standard of care of a phlebotomist. During the hearing, the issue was whether expert testimony was required in a phlebotomist negligence case, or whether summary judgment should be granted because the plaintiff failed to identify an expert witness. The following colloquy occurred during the hearing:

Counsel for Appellee, Mr. Peters: ... I know I have a nurse available. And I think she's qualified.

Court: I don't know who is qualified and who is not to tell you the truth because any medical person can and does draw blood. Nurses do it, doctors do it, quote phlebotomist, there are some people on hospital staff that do nothing but draw blood, but as you say there is no certification or licensure for that that anybody's given me any evidence for. It's internal training. I don't think I really realized that was such an unregulated field. People have been sticking needles in my arm since I don't know...

Mr. Peters: Some states require, but Kentucky doesn't.

Court: Which I think causes a major problem in this trial. This is clearly a medical procedure. It clearly has medical consequences. He has two experts that are going to testify that the cause of her problems was that drawing of blood, what we don't have is anybody, at least identified at this point, is anybody with the experience and skill to testify that it was done negligently ... what the proper standard of care would be for

drawing blood and I cannot leave that to the imagination of the jury. This is not something in my opinion that the common sense of a lay person can answer.

Mr. Peters: Judge in all honesty, with people out of town it is going to be difficult to get it done next week.

Court: I'm going to give Mr. Peters 30 days to get his witnesses identified that will prove his case in chief. And if they are not identified in reports to you within 30 days you renew your motion for summary on this issue... full [CR] 26 disclosures with that. And that means of course I'm going to have to give you a continuance, but that means I'm going to dismiss this case before I continue it again.

The trial court, Judge Noble, aptly articulated that the question was whether the unlicensed and unregulated medical field of phlebotomy required expert testimony to establish the standard of care. Notably there is little guidance on this specific issue in Kentucky. However, we have stated that "[t]he general rule is that expert testimony is required in a malpractice case to show that the defendant failed to conform to the required standard ..."[3]

■■ In the Kentucky Rules of Evidence, KRE 702 states that expert testimony is appropriate "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue...." If the subject matter of an issue in litigation is not common knowledge, then expert testimony is proper.[4] Expert witnesses give the jury the ability to evaluate the conduct of the party charged with malpractice in the context of the discipline.[5] The trial judge has wide discretion to admit or exclude evidence including that of expert witnesses.[6] Although it is not uncommon to have blood drawn during a medical examination, most persons would lack knowledge of the technical requirements of the process. Simply because having blood drawn is not uncommon or because such activity is unlicensed and unregulated does not mean that a jury would necessarily understand the specifics of the activity or the standard of care upon medical personnel, including phlebotomists, who draw blood. Other jurisdictions utilize expert testimony to aid the trier of fact in determining the standard of care in cases of harm caused by an improper blood draw.[7] As the standard of care is not within the scope of common experience of jurors, requiring expert testimony as to the standard of care of a phlebotomist was

3. *Jarboe v. Harting,* 397 S.W.2d 775, 778 (Ky. 1965)

4. *Greer's Adm'r v. Harrell's Adm'r,* 306 Ky. 209, 213, 206 S.W.2d 943, 946 (1947).

5. *Jarboe,* 397 S.W.2d at 778; *See, e.g.,* 7 Wigmore, Evidence, § 1917 (3d ed.1940).

6. *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590, 615 (1974); *Keene v. Commonwealth,* 516 S.W.2d 852, 855 (Ky.1974).

7. *Pipers v. Rosenow,* 39 A.D.2d 240, 243, 333 N.Y.S.2d 480 (N.Y.App.Div.1972) (holding that permitting jury to find malpractice from blood draw without expert testimony by applying the doctrine of *res ipsa loquitur* instead of eliciting expert testimony as to the standard of care to be reversible error); *Mengelson v. Ingalls Health Ventures,* 323 Ill.App.3d 69, 256 Ill.Dec. 38, 751 N.E.2d 91, 96 (2001) (noting that it is essential that plaintiff present expert testimony establishing that person conducting the blood draw was negligent and the negligence caused the injury); *Arbogast v. Mid–Ohio Valley Med. Corp.,* 214 W.Va. 356, 589 S.E.2d 498, 502–03 (2003) (holding expert necessary in case of negligent blood draw causing a hematoma because a jury cannot consider whether defendant acted negligently until standard against which the defendant's conduct is to be measured).

a proper exercise of trial court discretion.[8]

■ Central Baptist further contends that it was entitled to summary judgment because at the time the motion was heard by the trial court, Ms. Miller was without an expert to establish the phlebotomy standard of care. Rarely do we encounter claims of entitlement to summary judgment by one who lost at trial. Normally, the claim is presented as trial court error in failing to grant a directed verdict at the close of the evidence. Nevertheless, Central Baptist predicates its argument on the language of CR 56.03 that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Upon this basis, it insists that the trial court was obligated to grant summary judgment when the state of the record on the date of the hearing revealed that Ms. Miller could not prove her case.

■ At the outset, we observe that while the trial court's ruling with regard to the necessity of an expert witness was within the court's sound discretion, *see supra*, this issue was not so clear-cut that reasonable persons could not have differed. This Court has rendered numerous decisions in the medical negligence context in which expert witnesses were not required on the view that a lay juror was competent to analyze the conduct and render an appropriate verdict without the assistance of an expert witness.[9] As phlebotomy is an unlicensed field of practice and as numerous other medical providers routinely perform phlebotomy services, from the evidence is was not unreasonable for Ms. Miller to contend that no expert witness was necessary to determine that her injuries were caused by leaving the tourniquet her patient's arm too long or that the principle of *res ipsa loquitur* applied to the case. However, the trial judge, acting well within her discretion, saw it otherwise. In view of the foregoing, the trial court properly exercised its discretion to announce a ruling on the necessity of an expert witness and to grant Ms. Miller a reasonable time in which to procure an expert. Under these circumstances, not only did the trial court not err in failing to grant summary judgment, to have done so would have been extraordinary.

■ It is inappropriate to use a CR 56 summary judgment to resolve what is essentially a procedural dispute as to the need for an expert, the disclosure of the expert's identity, and the substance of the testimony.[10] In such disputes, it is within

---

8. *Keene,* 516 S.W.2d at 855.

9. Kentucky recognizes an exception to the general requirement of expert testimony to prove causation where the negligence is so apparent that a layperson would have no difficulty recognizing it. *See Perkins v. Hausladen,* 828 S.W.2d 652, 655 (Ky.1992) (discussing two following exceptions to general rule requiring expert testimony in medical malpractice cases: (1) where "any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care", and (2) when "medical experts may provide a sufficient foundation for *res ipsa*

loquitur on more complex matters."); *Jarboe,* 397 S.W.2d at 778 (holding that where the common knowledge or experience of laymen jurors is extensive enough to recognize or infer medical negligence from the circumstances then an expert witness is not necessary); *Harmon v. Rust,* 420 S.W.2d 563, 564 (Ky.1967); *Maggard v. McKelvey,* 627 S.W.2d 44, 49 (Ky.App.1981); *Butts v. Watts,* 290 S.W.2d 777, 778 (Ky.1956).

10. *Poe v. Rice,* 706 S.W.2d 5 (Ky.App.1986) (holding summary judgment inappropriate to resolve an "essentially procedural conflict").

the trial court's discretion to impose sanctions for failure to comply rather than to grant a summary judgment as a procedural sanction except in rare cases.[11] In *Ward v. Housman*, the Court of Appeals held that it was improper to grant summary judgment as a sanctioning tool where plaintiffs' counsel failed to comply with the court's discovery schedule by not disclosing in a timely manner an indispensable expert witness.[12] In *Housman*, the trial court issued an order excluding any expert testimony of witnesses not known after a certain date. After that date, however, plaintiff moved for reconsideration to allow their expert to testify because they would not be allowed to maintain their cause of action beyond the directed verdict stage of the litigation.[13] Likewise, in *M.P.S. v. Cabinet for Human Res.*, the Court of Appeals held that it was not an abuse of discretion to permit an expert to testify where disclosure of that expert to opposing counsel is disputed.[14]

It was not mandatory for the trial court to grant summary judgment, contrary to Central Baptist's contention. Ms. Miller had witnesses prepared to testify as to the standard of care of people who draw blood, although she did not have a named phlebotomy expert. Central Baptist's argument is unpersuasive as the summary judgment hearing established that expert testimony on the phlebotomy standard of care would be necessary. There was no abuse discretion or error of law.

## II.

■ Central Baptist's second argument is that the trial court should have granted a directed verdict on the issue of Ms. Miller's medical expenses. Central Baptist seeks to limit Ms. Miller's recovery to the amount actually paid or the amount actually collectable as a matter of law. It asserts that this is not a collateral source issue; rather it claims that the amount of alleged damages for which there is no obligation to pay is not a valid item to be submitted to the jury and awarded as damages. The jury awarded Ms. Miller $34,000 for medical expenses reduced to $22,100 by a 35 percent fault apportionment. She had sought $40,922.08 in medical expenses. The sum of $31,840 was billed by the doctor, but he received only $3,356.38 from Medicare. Central Baptist claims that Ms. Miller was only responsible for paying $3,356.38 (the amount actually paid by Medicare), and the remaining $28,483.80 was classified as a Medicare adjustment or Medicare write off. Central Baptist claims that the Medicare adjustment was Ms. Miller's windfall.

■■ It is improper to reduce a plaintiff's damages by payments for medical treatment under a health insurance policy if the premiums were paid by the plaintiff or a third party other than the tortfeasor.[15] The collateral source rule, as this rule is commonly known, allows the plaintiff to (1) seek recovery for the reasonable value of medical services for an injury, and (2) seek recovery for the reasonable value of medical services without consideration of insurance payments made to the injured party.[16] The collateral source rule has long

---

11. Cf. *Greathouse v. Am. Nat'l Bank & Trust Co.*, 796 S.W.2d 868 (Ky.App.1990).

12. 809 S.W.2d 717, 719 (Ky.App.1991).

13. *Id.* at 718–19.

14. 979 S.W.2d 114, 118 (1998).

15. *O'Bryan v. Hedgespeth*, 892 S.W.2d 571, 576 (Ky.1995) (holding statute allowing evidence of collateral source payments unconstitutional); 22 AM Jur.2d Damages 409 (2004).

16. 22 AM Jur.2d Damages 409 (2004). REST 2d TORTS § 920A (1979) ("Payments made to or benefits conferred on the injured

been followed in Kentucky.[17] Medicare benefits are governed by the collateral source rule and are treated the same as other types of medical insurance.[18]

In *O'Bryan v. Hedgespeth,* we stated that "[c]ollateral source benefits may relate to the plaintiff's need to recover damages from the wrongdoer, but they have no bearing on the plaintiff's right to recover such damages."[19] We held in *O'Bryan* that a liability insurance company should not receive a windfall for benefits the plaintiff is entitled to. We reasoned that because the insured procured a policy and paid the premiums that the benefits, including a windfall, inured to them.[20] The recent Court of Appeals decision in *Schwartz v. Hasty* reiterates the reasoning in favor of providing an injured party with any windfall associated with collateral source payments.[21]

> First, the wrongdoer should not receive a benefit by being relieved of payment for damages because the injured party had the foresight to obtain insurance. Second, as between the injured party and the tortfeasor, any so-called windfall by allowing a double recovery should accrue to the less culpable injured party rather than relieving the tortfeasor of full responsibility for his wrongdoing. Third, unless the tortfeasor is required to pay the full extent of the damages caused, the deterrent purposes of tort liability will be undermined.[22]

Along with the considerations underlying granting any windfall to the injured party is the fact that Ms. Miller paid her premiums and deserves all appropriate benefits. Moreover, it is absurd to suggest that the tortfeasor should receive a benefit from a contractual arrangement between Medicare and the health care provider. Simply because Medicare contracted with Ms. Miller's physician to provide care at a rate

---

party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.... *b. Benefits from collateral sources.* Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives... Perhaps there is an element of punishment of the wrongdoer involved. (See § 901). Perhaps also this is regarded as a means of helping to make the compensation more nearly compensatory to the injured party. (*Cf.* § 914A, Comment *b* ).")

**17.** *See Louisville & Nashville R.R. Co. v. Carothers,* 65 S.W. 833, 834 (Ky.1901); *McFarland v. Bruening,* 299 Ky. 267, 185 S.W.2d 247, 249 (1945); *Barr v. Searcy,* 280 Ky. 535, 133 S.W.2d 714, 715 (1939).

**18.** 22 AM Jur.2d Damages 409 (2004) *citing Our Lady of Mercy Hospital v. McIntosh,* 461 S.W.2d 377 (Ky.1970).

**19.** 892 S.W.2d at 576.

**20.** *Id.*

**21.** *Schwartz v. Hasty,* 175 S.W.3d 621, 626 (Ky.App.2005). (Citations omitted).

**22.** *Id.*

below usual fees does not relieve a tortfeasor from negligence or the duty to pay the reasonable value of Ms. Miller's medical expenses. Therefore, we hold that evidence of collateral source payments or contractual allowances was properly withheld from the jury and her award of medical expenses was proper.

## III.

 Central Baptist's final argument is that the trial court improperly limited its expert's testimony regarding the lab report but did not so limit Ms. Miller's expert on the same issue. Central Baptist claims that Denise Dunn's testimony that Ms. Miller's blood may have become hemolyzed was expert opinion that she was unqualified to make. Notably, the lab report in question was introduced by Central Baptist's expert Cynthia Applegate. The trial court limited her testimony on the topic to a statement that the lab report did not show any irregularities because Ms. Applegate was not identified as an expert qualified to interpret the lab report.[23] The lab report was stipulated into evidence as being one of Ms. Miller's medical records. Ms. Dunn and Ms. Applegate were both permitted to read from the record but not interpret its results. Likewise, counsel for both Central Baptist and Ms. Miller were permitted to read from the lab reports during their closing arguments. There was no unimpeachable expert testimony as Central Baptist contends because the testimony was limited to reading from the lab reports. Moreover, questions concerning the scope of evidence are left to the discretion of the trial court to determine whether to admit and exclude evidence.[24] An abuse of discretion occurs when a "trial judge's decision [is] arbi-

trary, unreasonable, unfair, or unsupported by sound legal principles."[25] The trial court was in the best position to determine whether to limit the scope of Ms. Applegate's testimony and discovering no apparent abuse of discretion, we defer to the trial court's judgment.

Accordingly, we affirm.

GRAVES, JOHNSTONE, ROACH, SCOTT, and WINTERSHEIMER, JJ., concur.

COOPER, J., files a separate opinion dissenting in part.

COOPER, Justice, dissenting in part.

Because of her age, Appellee Golda Miller is a Medicare beneficiary. In the trial of her medical malpractice lawsuit against Appellant, Baptist Healthcare Systems, Inc., d/b/a Central Baptist Hospital ("Central Baptist"), Miller introduced as evidence and recovered in the judgment medical expenses "charged" by Dr. Charles R. Combs in the total sum of $31,840.00 and by Neurodiagnostics, P.S.C., in the total sum of $1,700.00. However, because of their status as "participating providers" of Medicare services, Dr. Combs and Neurodiagnostics accepted from Centers for Medicare and Medicaid Services ("CMS") as payment-in-full for their services the sums of $3,356.38 and $791.07, respectively. The majority opinion characterizes the difference between the amounts charged and the amounts paid as "collateral source benefits," thus allowing Miller to prove and collect the amount "charged" and precluding Central Baptist from proving and limiting the judgment to the amount accepted as payment-in-full. That characterization ignores the realities of modern

23. CR 26.02.

24. *Keene v. Commonwealth,* 516 S.W.2d at 855.

25. *Goodyear Tire and Rubber Co. v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000).

health care, *i.e.,* "managed care," and the relationship between medical providers and medical payers, especially when the payer is, as here, the government.

## I. MEDICARE.

Prior to the Great Depression, physicians negotiated their own fees, usually accepting a sum based more on the patient's ability to pay than any other factor. Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits,* 21 Am. J. Trial Advoc. 453, 461 (Spring 1998). As the country sank deeper into depression, the American Hospital Association (AHA) sponsored the establishment of "Blue Cross," a tax-exempt, pre-payment plan for hospital care, which was designed to provide hospitals with a stable source of revenues from lower and middle-income patients. Sylvia A. Law & Barry Ensminger, *Negotiating Physician's Fees: Individual Patients or Society? (A Case Study in Federalism),* 61 N.Y.U. L.Rev. 1, 9 (1986). By 1942, similar plans, dubbed "Blue Shield," were created to fund physician's services. *Id.* at 9–10. Payment was made directly to the physician when the service was rendered. *Id.* The success of Blue Cross and Blue Shield encouraged private insurers to begin writing health insurance. Beard, *supra,* at 462–63. The payment to the provider was a percentage of the "usual, customary, and reasonable" (UCR) fee charged for a particular service. Providers participating in Blue Cross/Blue Shield accepted the UCR rate as full payment. *Id.* at 463.

In 1965, Congress enacted the Medicare Act,[1] now codified at 42 U.S.C. § 1395, to provide health care for the aged, and the Medicaid Act,[2] now codified at 42 U.S.C. § 1396, to provide health care for the indigent. By 1995, more than 40% of all health care expenditures were paid through these programs, as opposed to 32% by private insurance and 21% by individual patients. Beard, *supra,* at 464 (citing Sources of Financing for Health Care Services, Health Care Financing Review 1995 Statistical Supplement 14). As of 2001, 58% of expenditures for hospital care were paid by public payers (30% by Medicare, 17% by Medicaid, 11% by others), 34% by private insurance, and 3% by individual patients. CMS, *Health Care Industry Market Update, Acute Care Hospitals* 8 (July 14, 2003).

From 1965 until implementation of the Medical Fee Schedule in January 1992, Medicare reimbursed physicians for their "reasonable fees," defined as the lowest of (1) the physician's billed charge for the service, (2) the physician's customary charge, or (3) the prevailing charge for that service in the community. Beard, *supra,* at 464–65 n. 68 (citing Physician Payment Review Commission, 1997 Annual Report 484). Under this system, the providers controlled their own fees by increasing their charges annually to assure higher reimbursements the next year. *Id.* at 468.

To control the spiraling costs of government-paid health care, Medicare implemented a "prospective payment system," by which CMS, formerly known as the Health Care Financing Administration, establishes payment schedules based on diagnostic-related groups ("DRGs") for hospitals and a resource-based relative value scale ("RBRVS") for physicians. These

---

1. Health Insurance for the Aged Act, Pub.L. No. 89–97, 79 Stat. 290 (1965).

2. Grants to States for Medical Assistance Programs Act, Pub.L. No. 89–97, 79 Stat. 343 (1965).

pre-set payment schedules are based on the cost of the services rather than the billed, customary, or prevailing charges. *Id.* The DRGs and the RBRVS inform participating providers in advance what they will be paid for treatment rendered for particular types of illnesses or injuries and for particular types of medical treatments provided to Medicare patients. Susan Adler Channick, *The Ongoing Debate Over Medicare: Understanding the Philosophical and Policy Divides,* 36 J. Health L. 59, 69–70 (Winter 2003). "[Medicare] suppliers either take the price offered or they leave it. Given the historical importance of Medicare revenue to most providers, it has been rare for them to elect to 'leave it.'" *Id.* at 69. Since the DRG and RBRVS rates are not negotiable, it is technically incorrect to refer to the difference between those rates and amounts "charged" as "discounts" or "write-offs." In fact, the provider's "charge" for services rendered is irrelevant when, as here, Medicare makes payment as the primary payer as opposed to a "conditional payment" as a secondary payer under 42 U.S.C. § 1395y(b)(2)(B). "Charges" are only relevant under the secondary payer statutes where, *e.g.,* a policy of medical or liability insurance is the primary payer and costs are limited to those that are reasonable and customary. *See* 42 U.S.C. § 1395f. In summary:

> The Medicare program is structured upon a prospective payment system under which health care providers that agree to accept primary payment from Medicare are reimbursed on a flat fee basis determined by average cost and length of stay for various diagnostic related groups (DRGs). If a provider's actual cost falls below the DRG amount, it keeps the difference; if the provider's

actual cost exceeds the DRG amount, the provider absorbs or writes off the loss. Under the secondary payer statutes, the costs are limited to costs that are reasonable and customary.

*Rose v. Via Christi Health Sys., Inc./St. Francis Campus,* 113 P.3d 241, 246 (Kan. 2005).

Furthermore, in order to qualify as participating providers (and, thus, be entitled to direct payment from CMS, as well as other benefits), Dr. Combs and Neurodiagnostics agreed "not to charge, except as provided in paragraph (2) [deductibles and coinsurance [3]], any individual or any other person for items or services for which such individual is entitled to have payment made under this subchapter ...." 42 U.S.C. § 1395cc(a)(1)(A)(i). Thus, the acceptance by Dr. Combs and Neurodiagnostics of the payments authorized by the applicable DRG and/or RBRVS extinguished any additional potential liability of either Miller or Central Baptist to those providers. *Holle v. Moline Pub. Hosp.,* 598 F.Supp. 1017, 1021 (C.D.Ill.1984). Under the reasoning of *Our Lady of Mercy Hospital v. McIntosh,* 461 S.W.2d 377, 379 (Ky.1970), Central Baptist has a collateral-source-based liability to Miller for the sums CMS *actually paid* to Dr. Combs and Neurodiagnostics for Miller's treatment; and Miller is required to pay those sums over to CMS. 42 U.S.C. § 1395y(b)(2)(B)(ii); *Rybicki v. Hartley,* 792 F.2d 260, 262 (1st Cir.1986). "[T]he Medicare scheme is not one where the beneficiary contracts for double recovery. Most notably, Medicare has a right of subrogation allowing it to seek recovery of amounts paid to a beneficiary." *Rose,* 113 P.3d at 247. Central Baptist does not contest its liability for the sums actually paid. However, neither Miller nor Central

---

**3.** Any deductibles or copayments actually paid by Miller would not be payments from a "collateral source," so are not relevant to the issues on appeal.

Baptist has any further potential liability to Dr. Combs or Neurodiagnostics, both of whom have been paid in full. *Evanston Hosp. v. Hauck,* 1 F.3d 540, 544 (7th Cir. 1993); *Rybicki,* 792 F.2d at 262.

## II. COLLATERAL SOURCE RULE.

The collateral source rule originated in English common law and debuted in this country in *The Propeller Monticello v. Mollison,* 58 U.S. (17 How.) 152, 15 L.Ed. 68 (1854). "Monticello," a steamship, and "Northwestern," a schooner, collided on Lake Huron, causing "Northwestern" to sink with its cargo of salt. Mollison, the owner of "Northwestern," was insured, and his insurer compensated him in full for his loss. When Mollison sued the steamship, its owner raised as a defense that Mollison had already been fully compensated. The United States Supreme Court held that the insurance contract was "in the nature of a wager between third parties, with which the trespasser has no concern. The insurer does not stand in the relation of a joint trespasser, so that the satisfaction accepted from him shall be a release of others." *Id.* at 155. The term "collateral source" derives from language used in *Harding v. Town of Townshend,* 43 Vt. 536 (1870) ("The policy of insurance is collateral to the remedy against the defendant, and was procured solely by the plaintiff and at his expense, and to the procurement of which the defendant was in no way contributory.").

The collateral source rule first entered Kentucky's jurisprudence in 1901 (not prior to the adoption of our present Constitution, as suggested in *O'Bryan v. Hedgespeth,* 892 S.W.2d 571, 578 (Ky.1995)—a suggestion no doubt intended as a signal that any legislative attempt to abolish the rule would be challenged as unconstitutional under the so-called "jural rights" doctrine). In *Louisville & N.R. Co. v. Car-*

*others,* 65 S.W. 833 (Ky.1901), an opinion designated as "Not to be officially reported," our predecessor court stated without citation to authority that:

> The answer also attempted to plead as a defense that plaintiff had an accident policy entitling him to $30 a week from each of two companies, and that the plaintiff, by reason of his said contracts with said insurance companies, had presented a claim for insurance against the damages sustained by him, and that he was attempting to collect the same, all of which was stricken out, *and properly so.*

*Id.* at 834 (emphasis added). Later, the Court also held, again without citation to authority, that "[t]he question of plaintiff's employment or his accident policies could not be proven for the purpose of defeating or diminishing his right of recovery." *Id.*

In *Taylor v. Jennison,* 335 S.W.2d 902 (Ky.1960), our predecessor court specifically adopted "the rule":

> The general rule recognized in other jurisdictions is that damages recoverable for a wrong are not diminished by the fact that the injured party has been wholly or partly *indemnified for his loss* by insurance (to whose procurement the wrongdoer did not contribute).... It is a collateral contractual arrangement which has no bearing upon the extent of liability of the wrongdoer.

*Id.* at 903 (emphasis added). On the same day, May 20, 1960, the Court also rendered *Conley v. Foster,* 335 S.W.2d 904 (Ky. 1960), in which the plaintiff had been reimbursed for his medical expenses by the United Mine Workers' Welfare Fund, to which reimbursement he was entitled because of his UMW membership. The Court noted that the plaintiff had paid a monthly contribution out of his wages to obtain entitlement to the Welfare Fund's benefits and held that "in the absence of an assignment or express contractual sub-

rogation the injured person may recover medical and hospital expenses *incurred on his behalf,* at least where the expenses *are paid* pursuant to an agreement based upon the payment of premiums or contributions by or on behalf of the injured person." *Id.* at 907 (emphasis added).

In *Our Lady of Mercy Hospital v. McIntosh,* the Court held that there could be no offset for those portions of the plaintiff's hospital and medical bills that were *actually paid* by Medicare, perceiving that the plaintiff had paid a premium for those benefits. 461 S.W.2d 377, at 379.

[*McIntosh* assumed the patient had paid something for the Medicare coverage. *Id.* at 379. In fact, hospital care, "Medicare Part A," which was the medical expense at issue in *McIntosh,* is available to social security and railroad retirement recipients without payment of premiums. 42 C.F.R. § 406.6(a); 70C Am.Jur.2d *Social Security and Medicare,* § 2046. While premiums are charged for "Medicare Part B," which includes physician's bills, Part B is also funded partially by federal income and excise taxes imposed on every employed individual (through FICA withholding) and every employer in the United States, including, presumably, Central Baptist. 26 U.S.C. § 1401(b), 3101(b), 3111(b) Thus, it is arguable that there should be no collateral-source liability at all with respect to Medicare payments. *Burke Enterprises, Inc. v. Mitchell,* 700 S.W.2d 789, 796 (Ky.1985) ("There is a sharp distinction between collateral source benefits and payments by another person also charged with liability for the injury which is the subject matter of the lawsuit."); Restatement (Second) of the Law of Torts § 920A(1). If Miller can assert entitlement to the collateral source rule on the basis of having paid premiums for Medicare Part B coverage, Central Baptist can assert a defense to collateral source liability for having contributed to providing those benefits by payment of excise taxes because of its status as an employer. *See Hardaway Mgmt. Co. v. Southerland,* 977 S.W.2d 910, 918 (Ky.1998) ("The logic behind [the collateral source] rule is that there is no reason why a wrongdoer should receive the benefit of insurance obtained by the injured party for his own protection.... Of course, that logic does not apply here, where the wrongdoer, Hardaway, also obtained the insurance which paid the workers' compensation benefits to Southerland.").]

In *Daugherty v. Daugherty,* 609 S.W.2d 127, 128 (Ky.1980), we held that medical bills incurred by the plaintiff for treatment at a military hospital were both provable and collectable, even though not payable by her because of her father's status as a military servicemember.

The case at bar is similar to those involving Medicare and welfare funds. Although movant's father was not required to pay premiums in order to qualify for medical treatment at a military hospital, the coverage was nonetheless a direct benefit of his military service.

*Id.* at 128. In other words, the plaintiff's father "paid" for the treatment by serving in the military. *See also Rayfield v. Lawrence,* 253 F.2d 209, 213–14 (4th Cir.1958). The same reasoning applies when an employee's medical bills or lost wages are paid by the employer's insurance carrier as a fringe benefit of the employment. *Burke Enterprises,* 700 S.W.2d at 796; *Hellmueller Baking Co. v. Risen,* 295 Ky. 273, 174 S.W.2d 134, 136 (1943).

All of these cases rightly hold that the tortfeasor is not entitled to the benefit of the injured party's bargain when the injured party has purchased, either in cash

or in services, payment of medical bills actually incurred and either paid or owing. That is the nature of the "collateral source rule," as defined by these cases. It is an exception to the "strong public policy in this Commonwealth against double recovery." *Hardaway*, 977 S.W.2d at 918. Otherwise, "[t]he object of compensatory damages is to make the injured party whole to the extent that it is possible to measure his injury in terms of money. The object is not to place the plaintiff in a better position than he would have been had the wrong not been done." *Ky. Cent. Ins. Co. v. Schneider*, 15 S.W.3d 373, 374 (Ky.2000) (internal citations omitted). "The purpose of compensatory tort damages is to compensate; it is not the purpose of such damages to punish defendants or bestow a windfall upon plaintiffs." *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill.2d 353, 29 Ill.Dec. 444, 392 N.E.2d 1, 5 (1979). Nevertheless, the majority opinion in the case *sub judice* allows Miller to prove and collect medical expenses that were never incurred by her, were never owed by Medicare or any other entity, and payment for which was never expected by the medical providers. The majority purports to justify this result by substituting "reasonable value" for "expenses incurred" as the measure of damages. Ante, at 682. However, when a sum certain has been paid for services, the "reasonable value" cannot exceed the amount paid.

> When the plaintiff seeks to recover for expenditures made or liability incurred to third persons for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him.

Restatement (Second) of Torts § 911 cmt. h (1979). *See also Hanif v. Housing Auth.*, 200 Cal.App.3d 635, 246 Cal.Rptr. 192, 195–96 (1988) (" 'Reasonable value' is a term of limitation, not of aggrandizement.... [A] plaintiff is entitled to recover *up to, and no more than,* the actual amount expended or incurred for past medical services so long as that amount is reasonable."); *Goble v. Frohman*, 901 So.2d 830, 835 (Fla.2005) ("[R]ecovery for medical expenses [is limited] to the amount of medical expenses that he actually was obligated to pay.").

The better-reasoned opinions of jurisdictions that have addressed this issue hold that the collateral source rule does not apply to this kind of phantom expense that was never incurred.

> If Plaintiff could recover these fees without a showing of personal liability, she would reap a windfall recovery at the expense of the taxpayers, who made her Medicaid benefits possible. The collateral source rule does not apply because Plaintiff did not incur the Medicaid discount.

*McAmis v. Wallace*, 980 F.Supp. 181, 185 (W.D.Va.1997). (Like Medicare providers, Medicaid providers are required to accept the Medicaid payment as payment in full. 42 C.F.R. § 447.15. Thus, cases addressing the issue in the context of Medicaid "charges" versus actual payments are equally relevant to this issue.) *See also Hanif*, 246 Cal.Rptr. at 197 (limiting plaintiff's collateral-source recovery of medical expenses to $19,317, amount actually paid by Medi–Cal, not "reasonable value" of $31,618); *Coop. Leasing, Inc. v. Johnson*, 872 So.2d 956, 958 (Fla.Ct.App.2004) (limiting collateral-source recovery to $13,461 paid by Medicare, not $56,950.70 billed by medical providers: "[T]he reasonable value of medical services is limited to the amount accepted as payment in full for

medical services."); *Dyet v. McKinley,* 139 Idaho 526, 81 P.3d 1236, 1239 (2003) ("[T]he [Medicare] write-off . . . is not an item of damages for which plaintiff may recover because plaintiff has incurred no liability therefore."); *Rose,* 113 P.3d at 248 (amount of Medicare write-off must be credited against award for medical expenses, particularly where the Medicare provider was also the malpractice defendant); *Bates v. Hogg,* 22 Kan.App.2d 702, 921 P.2d 249, 253 (1996) ("[T]he collateral source rule is not applicable under these circumstances . . . . . [A] medical provider, by agreement and contract, may not charge Medicaid patients for the difference between their [sic] customary charge and the amount paid by Medicaid. Therefore, the amount allowed by Medicaid becomes the amount due and is the 'customary charge' under the circumstances we have before us."); *Kastick v. U Haul Co. of W. Mich.,* 292 A.D.2d 797, 740 N.Y.S.2d 167, 169 (2002) ("[Medicare] write-off . . . is not an item of damages for which the plaintiff may recover because plaintiff has incurred no liability therefor."); *Moorhead v. Crozer Chester Med. Ctr.,* 564 Pa. 156, 765 A.2d 786, 789–90 (2001) (limiting plaintiff's recovery to Medicare payment of $12,167.40, not "reasonable value" of $108,668.31: "[W]here, as here, the exact amount of expenses has been established by contract and those expenses have been satisfied, there is no longer any issue as to the amount of expenses for which the plaintiff will be liable. In the latter case, the injured party should be limited to recovering the amount paid for the medical services . . . . [W]e find that the collateral source rule is inapplicable to the additional amount of $96,500.91.").

I note in passing that although the majority cites and quotes *Schwartz v. Hasty,* 2003–CA–000796–MR, an opinion of the Court of Appeals addressing the collateral source rule in the context of underinsured motorist automobile insurance (and which is currently designated "not final and shall not be cited as authority in any courts of the Commonwealth of Kentucky"), *ante,* at 683, it ignores *Thomas v. Greenview Hospital, Inc.,* 127 S.W.3d 663 (Ky.App.2004), which addressed the collateral source rule in the context of, coincidentally, Medicare write-offs. "[T]he trial court acted properly in allowing Thomas to introduce the full amount of the medical expenses billed and then reducing the judgment to the amount payable to the providers following the trial." *Id.* at 675. In allowing the evidence, the Court of Appeals relied on *Beckner v. Palmore,* 719 S.W.2d 288 (Ky.App.1986), which mandated the same procedure with respect to medical bills previously paid in the form of basic reparation benefits (BRBs). Of course, the BRBs represented actual medical expenses incurred and paid, not phantom expenses such as Medicare write-offs. With respect to Medicare and Medicaid payments, I would limit both the evidence and the judgment to the amount actually incurred and paid.

As Professor Beard so aptly concluded:

A functional legal system should provide certain, fair, and rational rules to govern the affairs of its citizens. Moreover, given the concerns over the waste and inefficiency of our legal system, expecting legal rules to conform to the current economic realities seems reasonable. Oftentimes, the courts are not able to fully accommodate all these interests in deciding legal issues. However, a rule limiting the measure of recovery to paid charges (where the provider is prohibited from balance billing the patient) meets all of these criteria. Such a rule provides certainty without violating the principles protected by the collateral source rule. Even with a limit of recovery to the net loss there is no lessening of the deterrent force of tort

law, the defendant does not gain the benefit of the plaintiff's bargain, and the plaintiff receives full compensation for the amount of the expense he was obligated to pay. Certainly, the collateral source rule should not extend so far as to permit recovery for sums neither the plaintiff nor any collateral source will ever be obligated to pay.

Moreover, the paid charge rule comports with the economic realities of our time because it adopts the same assessment of value determined by the marketplace. The participants in the health care industry all recognize the impact of market competition on the pricing of health care. This realization on the provider's side is epitomized by the following comment in a well-respected medical economics publication: "If your stated fee for a procedure is $5,000, but no insurer is paying more than $2,500, what will you charge an out-of-network patient or someone with a medical savings account? ... If you're willing to take $2,500, then that's your fee."

Beard, 21 Am. J. Trial Advoc. at 489–90 (quoting Mark Crane, Getting Peanuts, Med. Econ., September 22, 1997, at 145, 146).

Accordingly, I dissent and would reverse this case for a new trial at which only the actual medical expenses paid would be introduced into evidence and awarded in the judgment.