589 S.E.2d 498

Rebecca M. ARBOGAST and Kevin Mark Arbogast, Plaintiffs Below, Appellees,

v.

MID–OHIO VALLEY MEDICAL CORP., a Corporation, d/b/a Mid–Ohio Valley Urgent Care, Defendant Below, Appellant.

No. 31314.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 8, 2003.

Decided Oct. 31, 2003.

Concurring in part and Dissenting in part Opinion of Justice Albright Nov. 4, 2003.

Dissenting Opinion of Justice McGraw Dec. 3, 2003.

Albright, J., concurred in part and dissented in part in separate opinion.

McGraw, J., dissented in separate opinion.

Stephen R. Brooks, Carol Ann Marunich, Flaherty, Sensabaugh & Bonasso, Morgantown, for Appellant.

William A. Davis, Nicole DiCuccio, Butler, Cincione & DiCuccio, Columbus, OH, Theodore Davitian, Davitian & Davitian, Parkersburg, for Appellees.

PER CURIAM:

Mid–Ohio Valley Medical Corp., d/b/a Mid–Ohio Valley Urgent Care (hereinafter referred to as "Mid–Ohio"), appellant/defendant below, appeals from a ruling by the Circuit Court of Wood County granting Rebecca M. Arbogast and Kevin Mark Arbogast (hereinafter referred to as "the Arbogasts") appellees/plaintiffs below, judgment as a matter of law on the issue of liability and a new trial on the issue of damages. Here, Mid–Ohio contends that the circuit court committed error by setting aside the jury's verdict, which jury verdict found Mid–Ohio was not liable for harm alleged by the Arbogasts. After a careful review of the briefs and record, as well as considering the oral arguments by counsel for the parties, we reverse.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 1996, Rebecca Arbogast went to Mid–Ohio for an evaluation and treatment of respiratory problems. During the evaluation, blood was drawn from Mrs. Arbogast's left arm by Tina Dunn, a laboratory technician employed by Mid–Ohio. The blood was extracted for the purpose of performing a complete blood count. When the evaluation was completed Mrs. Arbogast went home.

On April 1, 1996, Mrs. Arbogast returned to Mid–Ohio complaining of a bruise, pain, and numbness in her left hand. Mrs. Arbogast was seen by Dr. Allen Figueroa, who provided a diagnosis of "hematoma of the left arm."[1] Dr. Figueroa prescribed Advil for the pain. He instructed Mrs. Arbogast to apply heat to the arm, keep it elevated, and wear a sling.

Mrs. Arbogast returned to Mid–Ohio on April 8, 1996, as a result of continued pain and numbness in her left arm and hand. She was again seen by Dr. Figueroa. He noted the continued presence of hematoma on the left arm. Dr. Figueroa decided to refer Mrs. Arbogast to Dr. Yale D. Conley, a vascular surgeon, because he "was concerned that she could have some significant vascular injury."

On April 9, 1996, Mrs. Arbogast visited the medical office of Dr. Conley. In his medical notes concerning the visit, Dr. Conley wrote that Mrs. Arbogast was "experiencing pain from th[e] needle stick and maybe a small hematoma with some pressure on the nerve." Dr. Conley arranged for Mrs. Arbogast to have EMGs and nerve conduction studies on her left hand. In his follow-up medical notes dated April 24, 1996, Dr. Conley wrote:

"I have referred [Mrs. Arbogast] for nerve conduction studies and EMG's which documented a questionable very mild carpal tunnel which I feel is a coincidental finding. Obviously the needle stick could have exacerbated this problem, however, at the present time there's less pain. . . . I feel there's no problem here and this should not result in any permanent dysfunction and the inflammation that is present is resolving and should be completely resolved in the next several w[ee]ks."

As a result of continued pain, on July 12, 1996, Mrs. Arbogast went to the medical office of Dr. Gregg M. O'Malley, an orthopedic surgeon. Dr. O'Malley's medical notes from the visit ruled out signs of early or late complex regional pain syndrome (hereinafter referred to as "CRPS").[2] The notes also

---

1. Hematoma is "a localized collection of blood, usually clotted, in an organ, space, or tissue, due to a break in the wall of a blood vessel." Richard Sloane, *The Sloane–Dorland Annotated Medical–Legal Dictionary*, 331 (1987).

2. CRPS is caused by damage to a nerve. CRPS is also called reflex sympathetic dystrophy. During the trial, Dr. James Powers gave the following description of CRPS:

indicated that "[a]ll of her muscles in the forearm and hand function normally." Dr. O'Malley was unable to definitively diagnose the cause of Mrs. Arbogast's pain. He believed it might be attributed to carpal tunnel syndrome. On August 9, 1996, Mrs. Arbogast went again to Dr. O'Malley's office. Dr. O'Malley recommended surgery for nerve release at the left forearm level and carpal tunnel release on the left wrist. The surgery was performed on August 21, 1996.

Mrs. Arbogast continued to experience pain and numbness in her left arm and hand after the surgery. During a follow-up visit with Dr. O'Malley on March 7, 1997, he observed that Mrs. Arbogast's left arm was purplish and cold. Dr. O'Malley indicated that this might be an early sign of CRPS. Dr. O'Malley recommended treatment at a pain clinic.

On July 29, 1997, Mrs. Arbogast visited the medical office of Dr. James Powers. Mrs. Arbogast was referred to Dr. Powers by her counsel, in order "to come to some conclusions as to her problem, to make suggestions as far as treatment, and also to look at prognosis." Dr. Powers diagnosed Mrs. Arbogast as suffering from CRPS.

On March 20, 1998, Mrs. Arbogast and her spouse, Kevin Mark Arbogast, filed the instant action against Mid–Ohio, alleging negligence in the drawing of her blood which negligence was the proximate cause of her developing CRPS.[3] The case eventually went to trial in April of 2002. The jury returned a verdict for the defendant. The Arbogasts filed post-verdict motions for judgment as a matter of law or new trial. The circuit court granted the Arbogasts' motion for judgment as a matter of law on the issue of liability. The circuit court also granted a new trial on the issue of damages. Thereafter, Mid–Ohio filed this appeal.

## II.

### STANDARD OF REVIEW

▆▆▆  In this proceeding, we are asked to review the circuit court's order granting a post-verdict motion for judgment as a matter of law on the issue of liability, and a new trial on the issue of damages. In Syllabus point 3 of *Brannon v. Riffle*, 197 W.Va. 97, 475 S.E.2d 97 (1996), we stated:

> The appellate standard of review for the granting of a motion for a [judgment as a matter of law] pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is *de novo*. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a [judgment as a matter of law] when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a [judgment as a matter of law] will be reversed.

▆▆▆  We explained this standard in syllabus point 3 of *Alkire v. First National Bank*, 197 W.Va. 122, 475 S.E.2d 122 (1996), in part, by holding that "[w]hile a review of this motion is plenary, it is also circumscribed because we must review the evidence in a light most favorable to the nonmoving party." Moreover, in syllabus point 5 of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), we indicated, in part, that in our review we must "[1] assume that all conflicts in the evidence were resolved by the jury in favor of the

---

Q. Thank you. Now, would you explain for the jury what is complex regional pain syndrome, as best you can?

A. Yeah. This is a syndrome that actually was first described in the civil war, a hospital in Philadelphia. A physician had this group of patients who had this complex set of problems, and it has been known as a number of things: shoulder/hand syndrome, causalgia, atrophy. It deals with someone who has had some injury. It may be a blunt trauma. It may be a nerve injury that doesn't heal as most injuries to the body do.

It sets off a reverberating circuit, if you will, of pain and discomfort, and changes in the limb. And it is an entity whose name has changed over the years because, as time has gone on, we have different opinions as to what caused it. Like many things in medicine, we can describe them, and we can treat some things, but we don't always know what triggers them to start. And this is certainly one of those very difficult problems to deal with.

3. The complaint listed several other defendants, all of whom appear to have settled prior to trial.

prevailing party; [2] assume as proved all facts which the prevailing party's evidence tends to prove; and [3] give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Further, in syllabus point 2 of *Alkire v. First National Bank*, 197 W.Va. 122, 475 S.E.2d 122 (1996), we held, in part, that:

> In reviewing a trial court's granting of a motion for [judgment as a matter of law], it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below.

With due consideration for the foregoing standards, we now consider the substantive issues raised.

## III.

### DISCUSSION

■ To reach its verdict, the jury had to determine that Mid–Ohio did not breach the applicable standard of care and therefore was not liable. Alternatively, to reach its verdict, the jury had to determine that Mid–Ohio breached the applicable standard of care; but, that such breach *was not* the proximate cause of Mrs. Arbogast's injury.[4] The circuit court rejected the jury's verdict. The circuit court concluded that the evidence established that Mid–Ohio did in fact negligently breach the applicable standard of care and that such negligence was the proximate cause of Mrs. Arbogast's injury. In Syllabus point 5 of *Hatten v. Mason Realty Co.*, 148 W.Va. 380, 135 S.E.2d 236 (1964), we made clear that "[q]uestions of negligence [and] proximate cause ... present issues of fact for jury determination when the evidence pertaining to such issues is conflicting or where the facts, even though undisputed, are such that reasonable [persons] may draw different conclusions from them." In the instant proceeding we will address the propriety of the circuit court's ruling on negligence and proximate cause separately.

### A. Negligence

■ During the trial of this case, Mrs. Arbogast contended that Mid–Ohio breached the medical standard of care in extracting blood from her left arm. This Court has recognized that a " 'jury cannot consider whether a medical malpractice defendant has acted negligently until it has determined the standard against which the defendant's conduct is to be measured.' " *Reynolds v. City Hosp., Inc.*, 207 W.Va. 101, 108, 529 S.E.2d 341, 348 (2000) (per curiam) (quoting *Bell v. Maricopa Med. Ctr.*, 157 Ariz. 192, 755 P.2d 1180, 1183 (Ct.App.1988)).

Mrs. Arbogast sought to establish the standard of care for extracting blood from a patient's arm through the expert testimony of Dr. Beverly Kovanda. Dr. Kovanda testified that the standard of care for drawing blood from a patient was established in the National Committee for Clinical Laboratory Standards (hereinafter referred to as "NCCLS"). Under standards set by NCCLS, the person extracting blood should have the patient sit in a phlebotomy or venipuncture chair which has "armrests [to] provide support while preventing backbending of the elbow and subsequent flattening of the vein." Further, the NCCLS requires the person extracting the blood "[h]ave the patient position his/her arm to form a straight line from the shoulder to the wrist. The arm should be supported firmly by the armrest and should not be bent at the elbow."

In contrast, Mid–Ohio presented the expert testimony of Dr. Bruce Newman to address the issue of the standard of care for extracting blood. Dr. Newman testified that the standard established by the NCCLS "is what should be done under ideal conditions, but not what is being practiced. What is being practiced is the standard of care." Dr. Newman provided no data to support his opinion that a standard different from that established by NCCLS was being followed.

■ Mrs. Arbogast contends that Dr. Newman's testimony created a "locality rule" standard; yet, our case law requires the

---

4. The jury verdict form did not separate the issues of negligent breach of the standard of care and proximate cause. However, the jury was properly instructed on these issues.

standard of medical care be a national standard. We agree. In the single syllabus of *Paintiff v. City of Parkersburg,* 176 W.Va. 469, 345 S.E.2d 564 (1986), we succinctly held that "[t]he 'locality rule' in medical malpractice cases is abolished." Whether Dr. Newman's testimony was establishing a local or national standard of care was unclear at best. In fact, Dr. Newman's testimony left open for the jury to determine whether he was referring to a national standard or a local standard. Notwithstanding Dr. Newman's unsupported testimony on the standard of care, we are of the opinion that Dr. Kovanda clearly established the standard of care for extracting blood from a patient, as being that which was outlined by the NCCLS.

The evidence revealed the following procedure was used in extracting blood from Mrs. Arbogast's left arm. Mrs. Arbogast was seated on the edge of an examining table and instructed to hold out her left arm, with the knuckles of her hand lying on the inside of her left knee. No support was used to stabilize her left arm. A needle was thereafter inserted into her arm. Dr. Kovanda was asked to render an opinion as to whether the manner in which blood was extracted from Mrs. Arbogast complied with the national standard of care:

A. In my opinion, it did not meet the appropriate standard of care.

Q. Why not?

A. The arm was not supported. It was just extended in the air.

Q. And what is the purpose of having the arm supported by something?

A. For one thing, it is much easier to control how deep the needle goes, control where it goes. The anatomy is lined up in a very specific way when the arm is supported versus when it is just extended.

Dr. Newman testified that the manner in which blood was extracted from Mrs. Arbogast met the standard of care.

We have little hesitancy in determining that the evidence conclusively established that the standard of care for extracting blood, as set out by the NCCLS, was not followed. To the extent that the trial court found that the jury could not have reached a different conclusion, we agree. However, our inquiry does not end at this juncture.

### B. Proximate Cause

Merely finding that the evidence established that Mid–Ohio violated the standard of care for extracting blood *does not alone* impose liability for Mrs. Arbogast's injury. We have held that "[i]n a malpractice case, the plaintiff must not only prove negligence but must also show that such negligence was the proximate cause of the injury." Syl. pt. 4, *Short v. Appalachian OH–9, Inc.,* 203 W.Va. 246, 507 S.E.2d 124 (1998). Further, "[t]he burden is on the plaintiff to prove by a preponderance of the evidence that the defendant was negligent and that such negligence was the proximate cause of the injury." Syl. pt. 2, *Walton v. Given,* 158 W.Va. 897, 215 S.E.2d 647 (1975).

Mrs. Arbogast contended that, because Mid–Ohio did not follow the standard of care in extracting blood from her arm, the needle damaged a median vein in her arm, which resulted in her developing CRPS. In other words, Mid–Ohio's negligence was the proximate cause of her injury. Both parties presented hotly contested evidence on this issue.

Mrs. Arbogast testified that when the needle was placed in her arm she felt excruciating pain in her body. She did not scream out or inform Ms. Dunn of the pain. During the testimony of Dr. Powers, a witness for Mrs. Arbogast, he stated that although the EMG's did not reveal median nerve damage, the EMG's were not conclusive because they were taken for the purpose of examining the left wrist area. Dr. Powers was of the opinion that a thorough examination of the area where the needle was inserted may have revealed nerve damage. Dr. Powers also opined that the CRPS resulted from nerve damage caused by the insertion of the needle in Mrs. Arbogast's arm. Mrs. Arbogast's treating physician, Dr. Michael Shramowait, testified that Mrs. Arbogast, in fact, had median nerve damage in her left arm.

Mid–Ohio took the position that, if Mrs. Arbogast had CRPS, it was caused by the surgery performed by Dr. O'Malley. Mid–

Ohio presented the videotaped deposition of Dr. Mark J. Brown. Dr. Brown opined that the needle insertion did no damage to the nerve in Mrs. Arbogast's arm. During cross examination, Dr. Powers conceded that the carpal tunnel surgery performed by Dr. O'Malley could have caused the CRPS. During cross examination of Dr. Shramowait, he acknowledged that the surgery performed by Dr. O'Malley could have contributed to the development of CRPS. Further, during cross examination of Dr. Kovanda, she testified that she would expect a patient to voice a complaint if a median nerve was damaged and caused the type of pain experienced by Mrs. Arbogast. Dr. Brown also testified that had a median nerve been struck, Mrs. Arbogast "would have jumped, screamed, called it to someone's attention."

In our review of the evidence we are left with the definite conclusion that both parties presented strong and conflicting evidence on the issue of proximate cause. "The conflict between the[ir] two positions involves credibility and other factual determinations, issues within the province of a jury." *Gaither v. City Hosp., Inc.*, 199 W.Va. 706, 710 n. 4, 487 S.E.2d 901, 905 n. 4 (1997). *See also Brown v. Carvill*, 206 W.Va. 605, 611, 527 S.E.2d 149, 155 (1998) ("If reasonable persons could differ on the issue, the question is one for the jury[.]"). Indeed this Court has long held that "[w]hether the negligence of the defendant as charged in the declaration is the proximate cause of the plaintiff's injury, or whether the sole cause of the injury was the act of an independent third person, are questions of fact for jury determination." Syl. pt. 1, *Blankenship v. City of Williamson*, 101 W.Va. 199, 132 S.E. 492 (1926). *See also* Syl. pt. 2, *Evans v. Farmer*, 148 W.Va. 142, 133 S.E.2d 710 (1963) ("The questions of . . . proximate cause [and] intervening cause . . . are questions of fact for the jury where the evidence is conflicting or when the facts, though undisputed, are such that reasonable [persons] may draw different conclusions from them."). The jury heard the conflicting evidence on the issue of proximate cause and

found Mid–Ohio's evidence to be more convincing. Therefore, the trial judge improperly substituted its opinion on this hotly disputed factual issue. In *Toler v. Hager*, 205 W.Va. 468, 519 S.E.2d 166 (1999), we address this point as follows:

> If there is a conflict in the testimony on a material point, or if reasonable men may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury. The weight of a jury's verdict, when there is credible evidence upon which it can be based, is not overborne by the trial judge's disapproval.

*Toler*, 205 W.Va. at 476, 519 S.E.2d at 174 (quoting *Commonwealth v. McNeely*, 204 Va. 218, 222, 129 S.E.2d 687, 690 (1963)).

## IV.

## CONCLUSION

We reverse the trial court's order granting the Arbogasts judgment as a matter of law on the issue of liability and a new trial on damages. This case is remanded with instructions to reinstate the jury's verdict in favor of Mid–Ohio.

Reversed.

Justice ALBRIGHT concurs, in part; and dissents, in part; and files a separate opinion.

Justice McGRAW dissents and files a dissenting opinion.

ALBRIGHT, J., concurring in part, dissenting in part.

(Filed Nov. 4, 2003)

I concur with the decision of the majority reversing the judgment as a matter of law on the issue of liability entered by the lower court contrary to the verdict of the jury.[1]

---

1. Amendments to Rule 50 of the Federal Rules of Civil Procedure discontinued the terms "directed verdict" and "judgment notwithstanding the verdict," in favor of the phrase "judgment as a

matter of law." In West Virginia, the designation of a Rule 50 motion as a "motion for judgment notwithstanding the verdict" also changed to a "judgment as a matter of law" in the amend-

The reason for the trial court's action does not satisfactorily appear on the record.

I dissent from the decision of the majority to require the lower court to reinstate the verdict without offering the trial court an opportunity to amend its order of a new trial to include the issue of liability and state with particularity the trial court's reasons, if any, for awarding such a new trial on all issues. This Court's celeritous reinstatement of the jury verdict without affording such an opportunity is, in my view, shortsighted and in violation of precedents meticulously fashioned by the Court over the years.

It is abundantly clear that the trial court perceived something in the evidence and its consideration by the jury that generated the judge's lack of confidence in the verdict. In reacting to that lack of confidence, the trial court awarded judgment as a matter of law on the issue of liability and a new trial on the issues of damages, both of which are the subject of this appeal. Having found that judgment as a matter of law is not justified, the majority has failed to fairly consider whether the lesser remedy of a new trial on the issue of liability might be in order. Instead, the majority has substituted its own judgment without soliciting further input from the trial court. In doing so, I believe the majority has failed to consider the essential differences between the standard of review for a judgment as a matter of law and the standard of review for the granting of a new trial. In *Gonzalez v. Conley*, 199 W.Va. 288, 484 S.E.2d 171 (1997), this Court identified this significant distinction and explained as follows:

> The distinction between the effect of entering a judgment notwithstanding the verdict as opposed to granting a new trial is substantial and thus, warrants a different standard of review.... When a trial judge vacates the jury verdict by entering judgment notwithstanding the verdict, the trial judge is entering a final judgment which ends litigation on the issue upon which judgment has been entered. "In

performing this analysis, the credibility of the witnesses will not be considered, conflicts in testimony will not be resolved, and the weight of the evidence will not be evaluated." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995). *See also Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 128, 475 S.E.2d 122, 128 (1996)....

> Conversely, when a trial judge vacates a jury verdict and grants a new trial, he or she does not enter a final judgment. Thus, a trial judge granting a new trial has more discretion in determining whether such action is warranted.... In [weighing evidence and considering credibility], the trial judge does not invade the function of the fact finder because the trial judge granting a new trial is simply sending the issue back to the fact finder. Though this Court has made clear that the power to grant a new trial should be used sparingly, this Court will not review a trial judge's decision to grant a new trial unless the trial judge abuses his or her discretion.

199 W.Va. at 291–92, 484 S.E.2d at 174–75 (internal citations omitted).

This Court has previously vested substantial discretion in trial judges to consider granting a new trial, observing that a judge may set aside a jury verdict, provide reasons for that determination, and order a new trial. In syllabus point three of *Young v. Duffield*, 152 W.Va. 283, 162 S.E.2d 285 (1968), *overruled on other grounds, Tennant v. Marion Health Care Found.*, 194 W.Va. 97, 459 S.E.2d 374 (1995), this Court held: "The judgment of a trial court in setting aside a verdict and awarding a new trial is entitled to peculiar weight and its action in this respect will not be disturbed on appeal unless plainly unwarranted." Syllabus point four of *Young* explained: "An appellate court is more disposed to affirm the action of a trial court in setting aside a verdict and granting a new trial than when such action results in a final judgment denying a new trial." Sylla-

---

ment to Rule 50 effective April 6, 1998. *See Miller v. Triplett*, 203 W.Va. 351, 356 n. 8, 507 S.E.2d 714, 719 n. 8 (1998). In *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 457 S.E.2d 152 (1995), this Court observed that

"[t]he amendment did not, however, affect either the standard by which a trial court reviews motions under the rule or the standard by which an appellate court reviews a trial court's ruling." 193 W.Va. at 482 n. 7, 457 S.E.2d at 159 n. 7.

bus point five continued: "Courts are not required to believe that which is contrary to physical facts and if the verdict of the jury is based upon testimony which is contrary to physical facts, it will be set aside and a new trial awarded."

In *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995), this Court explained the standard of review for the grant of a new trial as follows:

[I]n reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

194 W.Va. at 104, 459 S.E.2d at 381.

In *In re State of West Virginia Public Building Asbestos Litigation,* 193 W.Va. 119, 454 S.E.2d 413 (1994), *cert. denied sub nom., W.R. Grace & Co. v. West Virginia,* 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995), this Court explained as follows:

Although the trial judge should rarely grant a new trial, the trial judge, nevertheless, has broad discretion to determine whether or not a new trial should be granted: "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.... Ultimately the motion invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited." [Charles Alan] Wright & [Arthur R.] Miller, *supra* [§ 2801] at § 2803 at 32–33 (footnotes omitted). However, it has been pointed out:

There are few subjects in the entire field of procedure that have been subject to so much change and controversy in recent years as the proper scope of review of an order granting or denying a motion for a new trial. The trial court has very broad discretion and the appellate courts will defer a great deal to his

exercise of this discretion. This much is settled.

Wright & Miller, *supra* at § 2818 at 118. 193 W.Va. at 124, 454 S.E.2d at 418.

In the syllabus of *Cook v. Harris,* 159 W.Va. 641, 225 S.E.2d 676 (1976), explained the rationale for such conclusions, as follows:

A trial judge is not merely a referee but is vested with discretion in supervising verdicts and preventing miscarriages of justice, with the power and duty to set a jury verdict aside and award a new trial if it is plainly wrong even if it is supported by some evidence, and when a trial judge so acts, his decision, being in discharge of his power and duty to pass upon the weight of the evidence to that limited extent, is entitled to peculiar weight and will not be disturbed on appeal unless clearly unwarranted.

This Court has also recognized that "[t]he trial court has opportunities to observe many things in the course of a trial which the printed record presented to an appellate court does not disclose ...." *Browning v. Monongahela Transp. Co.,* 126 W.Va. 195, 203, 27 S.E.2d 481, 485 (1943).

While the majority in the case sub judice premises its conclusions upon error regarding the granting of the judgment as a matter of law, the preferred resolution of this matter would entail a reversal of the judge's entry of the liability verdict in favor of the plaintiff and a remand for further consideration and articulation of grounds for a new trial. On remand, the rationale for any action regarding the grant of a new trial could be explained with specificity.

By simply reversing the lower court's determination, the majority has ignored the reality that the judge likely observed some discrepancy or inconsistency that in his view merited a new trial. The majority chose to focus its entire attention upon the error in granting the judgment as a matter of law on the issue of liability and ignored the broader issue. By reinstating the jury verdict, the majority has violated the spirit, if not the letter, of this Court's own rule that we shall give deference to the judge's determinations on the issue of granting new trials. More

importantly, we have substituted our judgment for that of the trial court on issues about which the trial court is likely better informed.

While I cannot express an opinion on the ultimate liability issue without knowing the judge's reasons for setting aside the jury verdict, I vehemently disagree with the majority's decision that the trial court's action justifies reinstatement of the jury verdict. A remand with instructions would have been a more appropriate resolution and would have served the purpose acclaimed by Justice Cleckley in his concurring opinion in *In re State Public Bldg. Asbestos Litigation*, that "[b]y broadening the authority of trial courts [to grant new trials] and limiting that of the appellate court [to review the same], we strike a decent note for judicial restraint and judicial economy." 193 W.Va. at 132, 454 S.E.2d at 426.

McGRAW, Justice, dissenting.

(Filed Dec. 3, 2003)

The majority correctly holds that Mid–Ohio negligently breached the standard of care when a medical technician employed there extracted blood from Appellee Rebecca Arbogast's left arm on March 26, 1996. As a direct result of the technician's negligence, Appellee Rebecca Arbogast immediately developed a large hematoma on her left arm, along with pain and numbness in her left hand and arm. Following surgery performed in an attempt to alleviate some of the pain and numbness caused by the negligently-performed blood draw, Appellee Rebecca Arbogast developed complex regional pain syndrome.

Experts for both Appellees and Mid–Ohio agreed that surgery would not have been necessary had the blood draw not have caused injury to Appellee Rebecca Arbogast's arm. It is horn book law that there may be more than one proximate cause of an injury. In the instant case, the trial judge saw clearly that Appellee Rebecca Arbogast's complex regional pain syndrome sprang from Mid–Ohio's negligence and, even viewing the evidence in the light most favorable to Mid–Ohio, that no *reasonable* trier of fact could have concluded otherwise.

Therefore, for the reasons stated, I respectfully dissent.