655 S.E.2d 775

Jonathan Brian WALKER, Plaintiff Below, Appellant

v.

Tara C. SHARMA, M.D., Defendant Below, Appellee.

No. 33308.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2007.

Decided Nov. 8, 2007.

Dissenting Opinion of Justice Benjamin Nov. 16, 2007.

Concurring Opinion of Chief Justice Davis Nov. 26, 2007.

William A. Davis, Nicole DiCuccio, Butler, Cincione & DiCuccio, Columbus, OH, for Appellant.

Tamela J. White, Neisha Ellis Brown, Farrell, Farrell & Farrell, PLLC, Huntington, for Appellee.

Albright, Justice:

Jonathan Brian Walker appeals from the June 21, 2006, order of the Circuit Court of Cabell County through which Appellee Tara C. Sharma, M.D., was granted judgment as a matter of law in a medical malpractice action. Appellant argues that the circuit court erred in concluding that Appellant's expert, Dr. Lewis, could not testify regarding the national standard of care, or any deviation therefrom, based on the expert's testimony that he was unfamiliar with the specific method employed to dilate urethral strictures at hospitals not located in Columbus, Ohio, where he practices. As a result of this conclusion, the trial court ruled at the conclusion of Appellant's case-in-chief that he had failed to meet his burden of proof on the issue of standard of care and causation. Upon a full review of the record in this case, we determine that the trial court committed error in concluding that an experienced, board-certified urologist could not testify as to the standard of care applicable to this case. Accordingly, the decision of the trial court is reversed and remanded for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

On January 3, 2003, Appellant, an otherwise healthy twenty-five-year-old male, presented to the emergency department of St. Mary's Medical Center in Huntington, West Virginia, seeking treatment for an inability to urinate. Initial efforts to place a catheter through the penis to relieve the urinary retention were unsuccessful. Dr. Sharma was called to the emergency room and he placed a suprapubic catheter into Appellant's bladder through a small lower abdominal incision.

On the following day, Dr. Sharma performed a cystoscopy[1] and attempted to dilate the urinary stricture. Appellee had successfully performed this same procedure on Appellant in 1995. In performing both the 1995 procedure and the 2003 procedure that is at issue here, Dr. Sharma used a prepackaged set of instruments manufactured by the Bard Company, which are known as the Bard Heyman Urologist Tray for the Obstructed Urethra (hereinafter referred to as the "Bard instrument set")During the procedure, Dr. Sharma passed the cystoscope through the urethra to the area of obstruction and attempted to pass the catheter through the constricted area. Dr. Sharma's notes from the procedure reflect that "the Hymen [sic] catheter did not seem to go into the bladder area." After removing the cystoscope, Dr. Sharma then began to pass the series of graduated dilators over the catheter. When Dr. Sharma detected resistance and the sensation of tissue being torn, he removed the dilator; reinserted the scope; and injected irrigating fluid through the scope. After observing fluid draining from the rectal area, Dr. Sharma realized that a perforation of the rectum had occurred. The procedure was aborted and a general surgeon was consulted. Following the consult, a diverting colostomy was performed on Appellant. Appellant was required to use a colostomy bag until August 2003 when surgery was performed to reverse the colostomy and reconnect the lower portion of his colon.

---

1. During this procedure, a cystoscope, which is a thin, tubular viewing instrument, is passed through the urethra to the area of obstruction. A very thin hollow catheter, also referred to as a filiform, containing a guidewire, known as a stylet, is passed through the scope and through the strictured area into the bladder. A series of hollow, tapered dilators are then passed over the catheter in increasingly larger diameters to stretch open the constricted area to permit normal urination.

Appellant subsequently instituted a medical professional. liability action against Dr. Sharma, through which he alleged that Appellee had breached the applicable standard of urologic care in connection with the 2003 urologic procedure. The sole issue of medical care for which Appellant sought recovery was the manner in which Dr. Sharma employed the Bard instrument set. There were no allegations of negligence with regard to preoperative care; post-operative care; or as to the timeliness of the detection of the complication. The only issue to be decided was whether Dr. Sharma correctly used the Bard instrument set in attempting to dilate the constricted area of Appellant's urethra.

The jury trial of this matter commenced on April 10, 2006. At the conclusion of Appellant's case-in-chief, Appellee made a motion pursuant to Rule 50 of the West Virginia Rules for Civil Procedure for judgment as a matter of law. The trial court granted this motion after concluding, "[b]ecause the testimony of Plaintiff's expert witness did not establish the standard of care or deviation therefrom on a national basis, plaintiff has failed to make a legal showing of medical professional liability by his failure to establish both what constituted the national standard of care and that a deviation from the national standard of care occurred." Appellant seeks a reversal of the trial court's ruling.

## II. Standard of Review

Our standard for reviewing a trial court's decision to grant a Rule 50 motion was set forth in syllabus point three of *Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996):

The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court, after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a directed verdict when only one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling

granting a directed verdict will be reversed.

We proceed to apply this standard to the case before us.

## III. Discussion

In explanation of its decision to grant judgment to Dr. Sharma, the trial court cited the mandatory elements of proof and minimal qualifications that are required for expert witnesses by the provisions of the Medical Professional Liability Act ("Act"). *See* W.Va. Code §§ 55–7B–1 to –12 (Supp.2007). Under the Act,

(a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care: (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

(2) Such failure was a proximate cause of the injury or death.

W.Va.Code § 55–7B–3.

Upon the trial court's determination that expert evidence is necessary to establish the standard of care in an action brought under the Act, there are specific foundational requirements for the admission of such testimony:

Expert testimony may only be admitted in evidence if the foundation therefor is first laid establishing that: (1) The opinion is actually held by the expert witness; (2) the opinion can be testified to with reasonable medical probability; (3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; (4) the expert witness maintains a current license to practice medicine with the appropriate licensing authority of any state of the United States: Provided, That the expert witness' license has not been revoked or suspended in the past year in any state; and (5) the expert witness is engaged or qualified in a medical field in

which the practitioner has experience and/or training in diagnosing or treating injuries or conditions similar to those of the patient. If the witness meets all of these qualifications and devoted, at the time of the medical injury, sixty percent of his or her professional time annually to the active clinical practice in his or her medical field or specialty, or to teaching in his or her medical field or speciality in an accredited university, there shall be a rebuttable presumption that the witness is qualified as an expert.

W.Va.Code § 55–7B–7.

In deciding whether Appellant had established the requisite standard of care that applied to this case, the trial court found conclusive the testimony of Dr. Lewis, Appellant's expert witness, "that he was not familiar with the methods employed for the dilation of urethral strictures at the hospitals in Huntington, West Virginia or at Duke University or at other hospitals where he does not practice." Based solely on Dr. Lewis' testimony that he lacked knowledge regarding the specific technique employed for dilating urethral strictures in hospitals outside of the Ohio venues in which he practiced, the trial court ruled that Appellant had failed to "establish both what constituted the national standard of care and that a deviation from the national standard of care occurred."

■ The decision regarding the qualification of a proffered witness to testify as an expert witness lies unquestionably within the discretion of the trial court. *See Kiser v. Caudill,* 210 W.Va. 191, 195, 557 S.E.2d 245, 249 (2001); *but see Cargill v. Balloon Works, Inc.,* 185 W.Va. 142, 146, 405 S.E.2d 642, 646

(1991) (recognizing that when an "expert witness is qualified by knowledge, skill, experience, training, or education as an expert and ... the individual's specialized knowledge will assist the trier of fact, it is an abuse of the trial court's discretion to refuse to qualify that individual as an expert"). In this case, the trial court had little difficulty in ruling that Dr. Lewis "was qualified to testify as an expert witness on the subject [urological procedures] pursuant to W.Va.Code § 55–7B–7." [2] Concerning the issue of Dr. Lewis' qualifications, the trial court found the following:

Plaintiff's expert witness, Robert Lewis, D.O., is a physician currently licensed to practice medicine in the State of Ohio; is board certified in the medical specialty of urology; and devotes in excess of 60% of his professional time to the active clinical practice of urology. *He further testified on direct examination that he is familiar with the standard of care required by a urologist through his training and research in the dilation of urethral strictures using the Bard instrument system;* and he holds opinions to a reasonable medical probability as to whether Dr. Sharma complied with acceptable standards of care in the performance of the procedure of January 4, 2003. As such, Dr. Lewis was qualified to testify as an expert witness on the subject pursuant to W. Va.Code § 55–7B–7. (emphasis supplied)

According to the trial court's order, Dr. Lewis "testified to and demonstrated on direct examination the manner in which the Bard system of instruments is used to dilate or stretch a urethral stricture." [3] Additional-

---

**2.** Given that Dr. Lewis was a board-certified, practicing urologist, Appellant had little difficulty establishing that Dr. Lewis met the standard we established in *Gilman v. Choi,* 185 W.Va. 177, 406 S.E.2d 200 (1990) (overruled on other grounds as stated in *Mayhorn v. Logan Med. Found.,* 193 W.Va. 42, 454 S.E.2d 87 (1994)), for determining whether a physician is qualified to offer testimony on the standard of care. That standard requires a showing that the physician has "more than a casual familiarity with the standard of care and treatment commonly practiced by physicians engaged in the defendant's specialty." 185 W.Va. at 181, 406 S.E.2d at 204.

**3.** We note that this case did not involve any "[t]horny problems of admissibility" which often "arise when an expert seeks to base his or her opinion on novel or unorthodox techniques that have yet to stand the test of time to prove their validity." *Gentry v. Mangum,* 195 W.Va. 512, 520, 466 S.E.2d 171, 179 (1995). Because there were no issues raised as to the validity of the scientific evidence being offered through the testimony of Dr. Lewis, the analysis set forth in *Daubert/Wilt* was not required in this case. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Wilt v. Buracker,* 191 W.Va. 39, 443 S.E.2d 196 (1993); *see also Gentry,* 195 W.Va. at 522, 466 S.E.2d at 181 (observing that because

ly, as reflected by the trial court's order, "Dr. Lewis testified that there were multiple methods of dilating urethral strictures[,]" with the Bard instrument method being one of those methods.[4] Despite his undisputed qualification as an expert in the area of urology, the trial court found that Dr. Lewis' lack of familiarity with the specific technique for dilating urethral strictures employed at various hospitals outside those in Columbus, Ohio, where he practiced, was fatal with regard to his ability to testify regarding the national standard of care to be applied to this case.

What this case demonstrates is how this Court's decision to abandon the locality rule[5] in medical malpractice cases in favor of a standard of care more national in approach is often misemployed to prevent qualified physicians from offering testimony in cases brought under the Act. *See Paintiff v. City of Parkersburg,* 176 W.Va. 469, 345 S.E.2d 564 (1986) (abolishing use of "locality rule" in medical malpractice cases); *accord Arbogast v. Mid–Ohio Valley Medical Corp.,* 214 W.Va. 356, 360–61, 589 S.E.2d 498, 502–03 (2003). While decided shortly before the enactment of the Act, the *Paintiff* case is nonetheless apposite with regard to the factors relied upon by the trial court in ruling on whether Appellant had demonstrated a national standard of care or deviation therefrom. In rejecting the testimony of two physicians offered as experts in *Paintiff,* the trial court found the first physician's testimony inadmissible because he could not testify "concerning the accepted, customary and usual medical practice and procedure among *general surgeons* in good standing in Parkersburg, West Virginia in 1981" because the physician at issue was an obstetrician-gynecologist licensed in West Virginia who did not practice in Parkersburg. 176 W.Va. at 470, 345 S.E.2d at 565. The second expert whose testimony the trial court rejected in *Paintiff* did practice in Parkersburg, but he too was an obstetrician-gynecologist rather than a general surgeon like the defendant doctor. In formally rejecting the locality rule,[6] this Court was emphatic in stating: "The trial court should not have excluded their testimony either because they were not general surgeons or because they were unfamiliar with the peculiarities of surgical practice in Parkersburg." *Paintiff,* 176 W.Va. at 471, 345 S.E.2d at 566.

As we observed in *Paintiff,* the need for employing a locality rule in medical malpractice cases was no longer present due to the omnipresence of medical information relative to the treatment of diseases and injuries:

"The same is true with respect to all new methods and devices of the surgical art. The ubiquity of such knowledge, the popularity of ethical standards in every part of the nation and the uniformity of curricula in medical schools have combined to create one community of medical practitioners out of the 48 states and the District of Columbia. Surely, a surgeon in San Luis Obispo has acquired practically the same knowledge of surgery that is practiced in both San Francisco and Los Angeles."

---

"most of the cases in which expert testimony is offered involve only qualified experts disagreeing about the interpretation of data that was obtained through standard methodologies[,] *Daubert/Wilt* is unlikely to impact upon those cases"); *accord* Fed.R.Evid. 702 advisory committee's note (2000 amends.) (noting that "review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule").

**4.** The trial court's order indicates that the method by which Dr. Lewis performs such dilating procedures is urologic endoscopy, a procedure that employs flexible cystocopes and either cutting instruments or lasers to open the stricture.

**5.** Under the locality rule, " 'the competence of an expert medical witness to testify about standard of care [wa]s determined by his familiarity with the care ordinarily exercised in the same locality in which the defendant practiced.' " *Paintiff,* 176 W.Va. at 471, 345 S.E.2d at 566 (quoting *Hundley v. Martinez,* 151 W.Va. 977[, 989–90], 158 S.E.2d 159[,166] (1967)). As we explained in *Paintiff,* the locality rule was a means of exempting " '[d]octors living and practicing in rural areas' " of this state from being " 'expected to possess the same degree of medical knowledge as ... their urban counterparts.' " 176 W.Va. at 471, 345 S.E.2d at 566 (quoting *Hundley,* 151 W.Va. 977[, 990], 158 S.E.2d 159[167] ).

**6.** We observed in *Paintiff* that the Court had "effectively emasculated the 'locality rule' in the case of *Hundley v. Martinez,* 151 W.Va. 977, 158 S.E.2d 159 (1967)." 176 W.Va. at 471, 345 S.E.2d at 566.

*Paintiff,* 176 W.Va. at 471, 345 S.E.2d at 567 (quoting *Gist v. French,* 136 Cal.App.2d 247, 288 P.2d 1003[,1017 (1955)]. The impetus for imposing a scope more national or uniform in approach for purposes of identifying the standard of care in medical malpractice cases was the recognition that doctors have substantially similar backgrounds in terms of education, training, and continuing exposure to medical information. Given the more uniform, or certainly comparable, availability of medical knowledge and techniques, the previous justification for limiting expert testimony in medical malpractice cases to those physicians whose practice was in the same locale or identical to the defendant doctor was essentially obliterated.

By eliminating the locality rule, courts such as ours clearly sought to remove the requirement that an expert was not qualified to testify in a medical malpractice case unless he was intimately familiar with local procedures and techniques. In reasoning that Dr. Lewis' extrajurisdictional practice prevented him from being able to testify as to the standard of care that applied in this case, the trial court hinged its decision on the same rationale which underlies the now-rejected locality rule. The trial court wrongly read into a national standard of care (which is nothing more than the rejection of the locality rule) a requirement that an expert has to be familiar with each and every procedure and piece of equipment used by local physicians to testify as to the standard of care. Simply put, the adoption of a standard of care that is national in approach does not prevent an otherwise qualified expert from testifying as to the applicable standard of care based solely on the fact that the expert employs a medically accepted but different method of performing the same type of procedure at issue in a medical malpractice suit.[7] We certainly appreciate that a given plaintiff might prefer to have as his expert a physician who is intimately familiar with the exact method or instrument set at issue in a given medical malpractice case. That, however, is nothing more than an issue of how much weight is to be accorded to the expert's testimony; it does not go to the admissibility of that expert's testimony in the first place. *See Gentry v. Mangum,* 195 W.Va. 512, 527, 466 S.E.2d 171, 186 (1995) (recognizing that "[d]isputes as to the strength of an expert's credentials, *mere differences in the methodology,* or lack of textual authority for the opinion go to weight and not to the admissibility of their testimony") (emphasis supplied).

■ As our case law makes clear, "Rule 702 of the *West Virginia Rules of Evidence*[8] is the paramount authority for determining whether or not an expert is qualified to give an opinion." Syl. Pt. 6, in part, *Mayhorn v. Logan Med. Found.,* 193 W.Va. 42, 454 S.E.2d 87 (1994) (footnote added). In this case, the trial court had no difficulty in determining that Dr. Lewis was qualified to offer expert testimony based on the fact that he was a board-certified urologist who spends more than sixty percent of his professional time in the active clinical area of urology. *See* W.Va.Code § 55–7B–7. The fact that Dr. Lewis was a board certified urologist certainly dispels any issue regarding his knowledge about the urologic condition for which Appellant was being treated.

And while the trial court ruled that Appellant had failed to meet his burden of proof on the issue of standard of care and causation, the record is replete with testimony that Dr. Lewis did in fact provide critical and compelling testimony in both these areas. The trial court's order reflects the following findings:

---

7. During oral argument, Appellant stated that Appellee's own expert witness did not use the Bard instrument set to perform urethral dilation procedures. We previously recognized that there are a variety of ways through which a physician may have received the degree of knowledge required to render an expert opinion. Those methods include practical experience, recent formal training and study, or a combination of these factors. *See Gilman,* 185 W.Va. at 181, 406 S.E.2d at 204.

8. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." W.Va.R.Civ.P. 702.

13. *Dr. Lewis testified* on direct examination to his expert opinion to a reasonable medical probability *that in performing urethral dilation using the Bard Heyman instrument system, applicable standards of care required a urologist to definitively confirm that the filiform catheter was in the urinary bladder before proceeding to pass dilators along the catheter.* He further testified that the belief or assumption of the surgeon that the catheter had passed into the bladder was not sufficient to comply with that standard of care. (emphasis supplied)

14. Dr. Lewis testified on direct examination to his expert opinion to a reasonable medical probability that Dr. Sharma deviated from that required standard of care as evidenced by the fact that in both copies of Dr. Sharma's dictated and signed Operative Report of the procedure as contained in Plaintiff's hospital records and Dr. Sharma's office records, and admitted into evidence, he states, "[T]he Hymen [sic.] catheter did not seem to go into the bladder area." In further support for his opinion, Dr. Lewis testified that an additional note dictated by Dr. Sharma, contained in his office records and admitted into evidence states, "I thought that we had went to the bladder, but apparently we did not."

After indicating that Dr. Lewis identified two alternative methods by which a surgeon can "definitively and visually confirm the placement of the catheter in the bladder," the trial court's order further reflects that Dr. Lewis offered specific testimony regarding the manner in which the standard of care was breached in this case:

17. *Dr. Lewis testified on direct examination to his expert opinion to a reasonable medical probability that Dr. Sharma deviated from the required standard of care of definitively and visually confirming bladder placement of the catheter by not employing either of the methods described in the instructions for use to visually confirm bladder placement.* In support of this opinion, Dr. Lewis testified that neither Dr. Sharma's Operative Note nor any other medical record contain any reference to the use of the methods described in the instructions for use or any other technique to definitively and/or visually confirm placement of the catheter in the bladder prior to the passing of the dilators. The medical records further contain no reference that the catheter was ever found or seen to be within the bladder. (emphasis supplied)

As to the issue of causation, the trial court found that:

18. Dr. Lewis testified on direct examination to his expert opinion to a reasonable medical probability that the failure of Dr. Sharma to comply with the applicable standards of care caused the rectal perforation by one of two potential and alternative mechanisms. . . .

20. Dr. Lewis testified on direct examination to his expert opinion to a reasonable medical probability that regardless of which mechanism produced the rectal perforation, in the attempted dilation of a urethral stricture using the Bard Heyman instrument system, such injury is an event which does not ordinarily occur in the absence of negligence. . . .

21. While Dr. Lewis testified that there were multiple methods of passing a catheter into the bladder, such as by direct vision, feel, indirect vision, aspiration of urine, passage of an endoscope through a suprapubic catheter, and taking of x-rays, *standards of care using the Bard Heyman instrument system required definitive confirmation of catheter placement in the bladder,* such as by methods listed in the instructions for use of the system. (emphasis supplied)

■ Where the trial court went astray in making its ruling was to equate Dr. Lewis' purported lack of familiarity with a particularized instrument system with lack of knowledge as to the standard of care that applied to the use of that set of instruments. The fact that Dr. Lewis, as a practicing urologist, uses a different method to perform a urethral dilation procedure [9] does not disqualify him from giving testimony on the standard of care to be employed when performing this

9. *See supra* n. 4.

type of procedure. Because Dr. Lewis was clear in his testimony that he personally used a different method than the defendant doctor, the jury would have been free to attach whatever weight they decided to Dr. Lewis' testimony given that he did not employ the Bard instrument set in performing the procedure at issue. *See Gentry,* 195 W.Va. at 527, 466 S.E.2d at 186. Following a trial court's decision that a physician is qualified to offer expert testimony in a given field, issues that arise as to the physician's personal use of a specific technique or procedure to which he or she offers expert testimony go only to the weight to be attached to that testimony and not to its admissibility. *See id.* at 527, 466 S.E.2d at 186.

Unlike the situation presented in *Kiser v. Caudill,* 215 W.Va. 403, 599 S.E.2d 826 (2004) (*"Kiser II"*), in which the expert witness specifically testified that he was not familiar with the standard of care that applied to tethered spinal cords at hospitals other than where he worked in Columbus, Ohio, Dr. Lewis never testified that he was unfamiliar with the *standard of care* applicable to the use of the Bard instrument set. *Id.* at 408, 599 S.E.2d at 831. What Dr. Lewis testified to was that he was not familiar with the specific methods used for dilation of urethral strictures at hospitals outside those in which he worked. This is a critical distinction. Because there were "multiple methods of passing a catheter into the bladder," the fact that Dr. Lewis could not definitively identify which particular method the Huntington hospitals employed (assuming there is just one method that is uniformly employed in all of the Huntington hospitals), this lack of information has no bearing on whether Dr. Lewis had been trained to employ methods other than that which he used to perform a urethral dilation procedure or whether he had the necessary education, training, or expertise

from which to identify the applicable standard of care that would pertain to use of the Bard instrument set.[10]

▪ Given our previous recognition that a physician can acquire the degree of knowledge necessary to render an expert opinion through multiple means, which include both training and research, a physician who is qualified in his field of expertise should not be limited to offering expert testimony relative to the standard of care in a medical malpractice case based on the specific techniques and or procedures that he/she employs in his personal practice. *See Gilman,* 185 W.Va. at 181, 406 S.E.2d at 204. Accordingly, where there are several approved methods of performing a particular medical procedure, the fact that a physician who is qualified to offer an expert opinion based on his field of practice and expertise utilizes a different method than the doctor whose actions are at issue does not prevent the physician from offering testimony on the applicable standard of care in a medical malpractice case. *See Wright v. Kaye,* 267 Va. 510, 593 S.E.2d 307, 313 (2004) (holding that three physicians in defendant physician's specialty who had never removed urachral cyst were qualified to testify as experts because applicable standard of care issue was laparoscopic surgery in vicinity of bladder with surgical stapler); *see also Todd v. United States,* 570 F.Supp. 670, 677 (D.S.C.1983) (observing that "mere fact that the plaintiff's expert may use a different approach or different instrument in performing surgery is not considered a deviation from the recognized standard of medical care"). The critical inquiry to determining whether Dr. Lewis was qualified to testify on the standard of care was his degree of knowledge regarding the standard of care applicable to urethral dilation procedures.[11]

---

**10.** *See supra* n. 7 (identifying various ways in which physician may obtain knowledge necessary to render expert opinion).

**11.** The pleadings in this case framed the instant case in terms of the standard of care not being met for an attempted urethral dilation procedure and the failure to employ appropriate surgical techniques. As a practicing urologist who had performed numerous urethral dilation procedures, the record demonstrates that Dr. Lewis

had the requisite knowledge of the standard of care applicable to such procedures. Had this case been framed as the failure to properly employ the Bard instrument set while performing a urethral dilation, the result in this case might be different. *See Wright,* 593 S.E.2d at 313 (discussing how pleadings shaped medical malpractice case in terms of standards of care applicable to laparoscopic surgery in general as opposed to

The record is clear in this case that Dr. Lewis testified that he was "familiar with the standard of care required by a urologist through his training and research in the dilation of urethral strictures using the Bard instrument system." Moreover, as Dr. Lewis testified, regardless of the method employed for dilating a urethral stricture, the standard of care required initially that the surgeon follow the manufacturer's instructions pertinent to the chosen set of instruments. And with regard to the Bard instrument set chosen by Dr. Sharma, the standard of care required that the surgeon "definitively confirm that the filiform catheter was in the urinary bladder before proceeding to pass dilators along the catheter."

Upon our careful review of the record in this matter, we are convinced that the trial court committed error in ruling that Appellant had failed to meet his burden of proof with regard to the standard of care and causation. Quite simply, the trial court wrongly employed the precept of employing a standard of care that is national in approach to determine that Dr. Lewis' lack of familiarity with the particular method employed by surgeons operating at Huntington area hospitals prevented him from testifying as to the standard of care applicable to this case.[12] Given that Dr. Lewis' education, training, and practice clearly qualified him to offer an opinion in this matter, the trial court should have permitted the case to proceed to a jury; it was up to the panel to determine what weight to accord Dr. Lewis' testimony on the issue of standard of care and causation.[13]

Based on the foregoing, the order of the Circuit Court of Cabell County is hereby reversed and this matter is remanded for further action consistent with this opinion.

Reversed and remanded.

Chief Justice DAVIS concurs and reserves the right to file a concurring opinion.

Justice BENJAMIN dissents and reserves the right to file a dissenting opinion.

BENJAMIN, Justice, dissenting:

(Filed Nov. 16, 2007)

I fear that the majority, although it purports to enunciate rules of law consistent with our prior holdings, has actually served to obliterate the gatekeeping function of the circuit court by ignoring the obvious factual distinctions on which this case turns. The case *sub judice* does not merely involve an expert who testified about a method of urethral dilation that he possessed the requisite expert knowledge about, but simply chose not to use. Rather, this case involves an expert who was clearly not qualified to render an opinion regarding the national standard of care about a particular method of urethral dilation, because he did not possess the requisite formal training and study, or prior clinical experience in utilizing that method.

Unquestionably, an expert testifying in medical professional liability cases must possess the fundamental knowledge and expertise in the subject at issue as well as the national standard of care. W. Va.Code 55–7B–7 (2003); *Kiser v. Caudill*, 210 W.Va. 191, 196, 557 S.E.2d 245, 250 (2001). In order to be qualified as an expert witness in a medical professional liability action, it must be shown that, "(3) the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care to which his or her expert opinion testimony is addressed; ..." W. Va.Code § 55–7B–7.

This Court has previously held that "[i]n determining who is an expert, a trial court should conduct a two-step inquiry. First, a circuit judge must determine whether the

limiting issue of malpractice to specific removal of urachral cyst with stapler).

**12.** The rejection of a locality rule in favor of a national approach to standard of care was never intended to limit expert testimony to only those areas where the physician is intimately familiar with each and every procedure and technique employed. Through its ruling in this case, the

trial court effectively negated the intent to eliminate the geographical limitation that the locality rule encompassed.

**13.** As mentioned above, Appellee's counsel could certainly argue to the jury that Dr. Lewis' limited experience with the Bard instrument set affects the weight that should attach to his testimony.

proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, the circuit court must determine that the expert's area of expertise covers the *particular opinion as to which the expert seeks to testify. There must be a match.*" *Gentry v. Mangum*, 195 W.Va. 512, 525, 466 S.E.2d 171, 184 (1995) (citing *Cargill v. Balloon Works, Inc.*, 185 W.Va. 142, 405 S.E.2d 642 (1991)). (Emphasis added).

West Virginia Code § 55–7B–7(a) expressly provides that in order to establish the standard of care, an expert witness must possess the specialized knowledge and expertise in the issue presented. "[T]o qualify a witness as an expert on that standard of care, the party offering the witness must establish that the witness has *more than a casual familiarity with the standard of care and treatment* commonly practiced by physicians engaged in the defendant's specialty." *Gilman v. Choi*, 185 W.Va. 177, 181, 406 S.E.2d 200, 204 (1990)(overruled on other grounds, *see Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994) (*quoting Greene v. Thomas*, 662 P.2d 491, 493 (Colo.Ct.App.1982)). (Emphasis added). "A medical witness may acquire sufficient knowledge to qualify as an expert through *practical experience, recent formal training and study or a combination of these factors* " *Id.* (Emphasis added). It is well settled that "knowledge gained only in the context of litigation does not meet the threshold requirement of competency 'under the same or similar circumstances.'" W.Va.Code § 55–7B–3 (2003); *Hicks v. Chevy*, 178 W.Va. 118, 121, 358 S.E.2d 202, 204 (1987).

In the instant case, the majority finds that Dr. Lewis, as a practicing urologist who had performed numerous urethral dilation procedures, had the requisite knowledge of the applicable standard of care based on the fact that the pleadings in this case framed the issue generally in terms of "the standard of care not being met for an attempted urethral dilation procedure and the failure to employ appropriate surgical techniques." The majority reasons that if this case had been specifically pled and framed as the failure to properly employ the Bard instrument set while performing a urethral dilation, instead of being generally pled, the result in this case might be different. However, regardless of whether the pleadings in this case were initially framed in more generalized terms, it is evident that the specific issue to be decided at trial was whether Dr. Sharma correctly used the Bard instrument set in attempting to dilate the constricted area of the Appellant's urethra. Because the Appellant's expert was not qualified to discuss the standard of care regarding this particular issue, I believe the circuit court's ruling was appropriate.

It is evident that the Appellant's expert, Dr. Lewis, had nothing more than a casual familiarity with the Bard method. Dr. Lewis admitted that he had no knowledge of the Bard method prior to litigation. In fact, the first time he learned of the Bard method was after the case was filed and in preparation for his deposition. He actually had to read the package insert directions to become familiar with the Bard instrument set in order to testify about the procedure. Dr. Lewis also had no clinical experience using the Bard method at the time he testified at trial, and he conceded that he would have to make assumptions as to that which constitutes the applicable standard of care in the clinical circumstances present in this case.

The majority reasons that the trial court went astray in making its ruling when it equated Dr. Lewis' lack of familiarity with a particularized instrument system with lack of knowledge as to the standard of care that applied to use the set of instruments. However, I believe this holding ignores the facts of this case, and particularly how such facts apply to our well-established law. Because Dr. Lewis had neither the *practical experience* nor the *recent formal training and study* of the Bard method, it was appropriate for the circuit court, in that specific connection, to properly conclude that the Appellant failed to meet his burden of proof on the issue of standard of care and causation. Obviously, how could Dr. Lewis testify regarding the national standard of care applicable to the Bard method when he has nothing

more than casual familiarity with this dilation procedure?

I acknowledge that because of the "liberal thrust" of our rules of evidence pertaining to experts, this Court, in erring on the side of expert admissibility, has previously held that "[d]isputes as to the strength of an expert's credentials, *mere differences in methodology,* or lack of textual authority for the opinion go to weight and not to the admissibility of their testimony." *Gentry v. Mangum,* 195 W.Va. at 527, 466 S.E.2d at 186. (Emphasis added). However, this Court has not held, nor should it now hold, that an expert who lacks both formal training and study *and* clinical experience regarding a particular methodology, when it is the *sole* particular issue to be decided at trial, can adequately testify as to the national standard of care in a medical professional liability action.

Our law is clear that where the plaintiff's expert lacks the experience or knowledge of the method chosen by the defendant health care provider, and the only evidence to be presented concerning the method is by and through the defendant health care provider, the plaintiff has not met the requisite showing of malpractice and judgment as a matter of law is warranted. W. Va.Code § 55–7B–3; *Gentry v. Mangum,* 195 W.Va. 512, 466 S.E.2d 171 (1995). Accordingly, because the Appellant failed to meet his burden of proof on the specific issue of whether Dr. Sharma violated the national standard of care in using the Bard instrument set, I believe the circuit court properly granted the Appellee's motion for judgment as a matter of law.

For these reasons, I dissent.

DAVIS, C.J., concurring:

(Filed Nov. 26, 2007)

The instant appeal required this Court to decide yet another case involving the testimony of an expert witness. While this case is distinguishable from other recent decisions of this Court involving the exclusion of expert witness testimony insofar as the West Virginia Medical Professional Liability Act (hereinafter "the MPLA") provides additional admissibility guidelines, the mere fact that this case is before us provides further proof that the trial courts of this State continue to experience difficulties when ruling upon matters involving expert witnesses. *See San Francisco v. Wendy's Int'l, Inc.,* 221 W.Va. 734, 656 S.E.2d 485 (2007); *State ex rel Jones v. Recht,* 221 W.Va. 380, 655 S.E.2d 126 (2007). *See also* W. Va.Code § 55–7B–3(a) (2003) (Supp.2007) (reciting "necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care"); W. Va.Code § 55–7B–7(a) (2003) (Supp.2007) (requiring plaintiff to establish "[t]he applicable standard of care and a defendant's failure to meet the standard of care" by expert testimony and providing guidelines therefor). Unlike the *Jones* and *San Francisco* cases, however, the primary challenge faced by the trial court in this case involved the scope of the expert testimony presented by the appellant. The trial court determined that such testimony did not satisfy Mr. Walker's burden of proof as to the standard of care and causation in accordance with the MPLA. The majority opinion correctly determined, though, that Dr. Lewis's testimony was sufficient to satisfy Mr. Walker's burden of proof.

In this case, the trial court erroneously applied the now obsolete locality rule to find that Dr. Lewis was not qualified to render an opinion as to the standard of care applicable to Mr. Walker's claims of medical negligence. The trial court determined that Dr. Lewis's credentials qualified him as an expert in the field of urology but concluded that Dr. Lewis's lack of familiarity with the particular methodology employed by Mr. Walker's treating physician rendered him unable to testify as to the national standard of care and whether a deviation therefrom had occurred. Instead, having determined Dr. Lewis to be competent to testify as an expert, the trial court should have permitted the jury to assess the proper weight to be afforded to Dr. Lewis's testimony vis-a-vis his employment of and familiarity with a treatment practice different from that employed in Mr. Walker's actual treatment. *See Watson v. Inco Alloys Int'l, Inc.,* 209 W.Va. 234, 243–44, 545 S.E.2d 294, 303–04 (2001) ("Once a witness is permitted to testify, it is within the province of the jury to evaluate the testimony, creden-

tials, background, and qualifications of the witness to address the particular issue in question. The jury may then assign the testimony such weight and value as the jury may determine." (internal quotations and citations omitted)); Syl. pt. 4, in part, *Mayhorn v. Logan Med. Found.*, 193 W.Va. 42, 454 S.E.2d 87 (1994) ("The jury, and not the trial judge, determines the weight to be given to the expert's opinion.").

Insofar as the majority correctly determined that the appellant's expert witness was qualified to render an opinion as to standard of care and causation and that questions as to the weight to be accorded to the expert's testimony were properly within the province of the jury, I concur in the majority's decision.